**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Lily BORROMEO, Claimant–Appellant,**

and

**Seven (7) Parcels of Real Property; Two (2) Automobiles; Undetermined Amount of United States Currency Contained in Several Bank Accounts, Stocks, Bonds, Securities and Other Negotiable Instruments and Various Items of Personal Property, Defendants.**

**No. 90–6423.**

United States Court of Appeals,
Fourth Circuit.

Argued May 9, 1991.

Decided Sept. 17, 1991.

John G. Hackney, Jr., Charleston, W.Va., argued, for claimant-appellant.

Stephen Michael Horn, Asst. U.S. Atty., Charleston, W.Va., argued (Michael W. Carey, U.S. Atty. and Thomas L. Stanley, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before HALL and WILKINSON, Circuit Judges, and KELLAM, Senior District Judge for the Eastern District of Virginia, sitting by designation.

## OPINION

K.K. HALL, Circuit Judge:

Lily Borromeo appeals the district court's order denying her motion to file a verified claim out of time, in this action brought by the United States for civil forfeiture of assets tainted by the drug distribution crimes of her estranged husband, Dr. Abel Borromeo. We reverse and remand.

## I.

Appellant Lily Borromeo is the former wife of Dr. Abel Borromeo. The two were married in the Philippines in 1952, and Lily bore ten children from the marriage. At some point not disclosed by the record, the two separated. Abel came to Charleston, West Virginia, to practice medicine, while Lily stayed behind in Seattle, Washington. Abel took a mistress in Charleston and fathered two more children. Lily has never lived in West Virginia.

In 1989, Dr. Borromeo got into trouble. On November 15, 1989, a 57–count indictment was returned against him (55 counts of illegal prescriptions of controlled substances, one of obstruction of justice, and one of racketeering). He was convicted of 53 counts on September 19, 1990.

This forfeiture action was filed November 20, 1989. The government did not serve the complaint and warrant of arrest *in rem* on appellant because it believed that she was no longer married to Abel. The government reached this conclusion from Abel's tax returns, on which he had listed himself as "single" and his $30,000/year payments to Lily as "alimony." Not-

withstanding this initial misapprehension, the government was aware that appellant was still married to Abel by no later than January 3, 1990, as is revealed in the record by the affidavit of an Assistant United States Attorney. At this time, the government was still engaged in serving process; its affidavit of service by publication was not filed until January 29, 1990. Nonetheless, the government did not mail notice to appellant.

Contemporaneously with these events, a divorce action was being resolved between Lily and Abel in the state of Washington. On February 9, 1990, a property settlement agreement was reached, in which Lily was given 60% of two accounts, worth about $264,000, at One Valley Bank in Charleston.* In order to prepare the property settlement agreement, Lily and her divorce counsel needed a description of Abel's property. Abel sent them a copy of part of the government's forfeiture complaint. Descriptions of property were copied verbatim.

On May 1, 1990, a Washington state court entered a divorce decree. A Qualified Domestic Relations Order was entered June 7, 1990, which entitled Lily to the funds from One Valley Bank. On June 21, 1990, Lily's Washington divorce counsel, Katherine Ross, called the bank, and spoke to the administrator of the funds. The administrator informed Ross that the government had put a "freeze" on the assets, but that the administrator had spoken to Tom Stanley, an Assistant United States Attorney, who had indicated that he would release the money to Lily. Lending more credibility to this statement, the administrator reported that the government had actually allowed the release of money to some of Dr. Borromeo's employees.

The administrator also gave Stanley's telephone number to Ross. Ross left a message for Stanley on June 21, detailing that she represented Lily and wished to inquire as to how to segregate Lily's funds from the frozen assets. Stanley did not return the call. Still, from her conversa-

* These accounts are a "Money Purchase Pension Plan" and "NonIntegrated Profit Plan."

tion with the administrator, Ross was not worried.

On July 9, 1990, Ross received written notice of the freeze from the bank. A month passed. Ross again left messages for Stanley on August 6 and August 7; she again received no response. On August 8 and 10, she spoke to Pat Donahue, a bank employee who had drafted the accounts' documents. On the second occasion, Donahue suggested that she contact a Charleston criminal attorney for assistance. Ross has no experience with federal forfeiture cases. Donahue referred Ross to a Charleston attorney, John Hackney, and Lily soon retained him. On September 4, 1990, Lily filed a motion for enlargement of time to file her verified claim, along with the verified claim itself. The government opposed her motion, arguing that she had knowledge of the action in January (from the complaint excerpts she received from Dr. Borromeo) and at the latest in July, and her failure to act could not be deemed "excusable neglect." *See* Fed.R.Civ.P. 6(b)(2). The government made no allegation that it would be prejudiced by Lily's intervention.

Lily then submitted the affidavit of Ross, which details her failed attempts to contact Stanley and her initial understanding that the government was not interested in keeping Lily's money. She characterized the documents she saw in January as "some portion of a complaint," though not the entire complaint. In an unverified pleading, Lily asserted that she did not know of the forfeiture action until July and had no idea that time limitations existed to file her claim until she conferred with her current counsel in late August.

On September 28, 1990, Lily moved for a hearing on her motion for enlargement of time. She intended to travel to West Virginia to offer her live testimony about what she knew and when. The district court summarily denied this motion during a telephone conversation with the opposing attorneys. On October 12, the district court denied the motion for enlargement of time. After two motions to reconsider were denied, Lily appealed. On April 10, 1991, the district court entered summary judgment forfeiting the assets described in the complaint.

Lily moved to stay transfer of the assets to the government pending appeal. We denied the motion. Such a stay was not necessary because this circuit has held that it does not lose jurisdiction over the government *in personam* though the forfeited *res* has been deposited in the government's coffers. *United States v. $95,-945.18,* 913 F.2d 1106 (4th Cir.1990).

## II.

### A.

■■■ The Supplemental Rules for Certain Admiralty and Maritime Claims apply to civil forfeiture proceedings brought pursuant to 21 U.S.C. § 881. Rule C(6) requires a verified claim within ten days "after process has been executed." Lily's obvious first argument follows from the rule's plain language. She was never served with process, and service by publication is constitutionally insufficient where actual notice by mail is feasible. *Mennonite Board of Mission v. Adams,* 462 U.S. 791, 800, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983); *Robinson v. Hanrahan,* 409 U.S. 38, 40, 93 S.Ct. 30, 31, 34 L.Ed.2d 47 (1972); *Cepulonis v. United States,* 543 F.Supp. 451, 453 (E.D.N.Y.1982). Due process protections ought to be diligently enforced, and by no means relaxed, where a party seeks the traditionally-disfavored remedy of forfeiture. *E.g., United States v. $39,000 in Canadian Currency,* 801 F.2d 1210, 1216–1217 (10th Cir.1986); *see* Supp.Rule E(2)(a) (complaint shall state claim "with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and frame a responsive pleading"). The Eleventh Circuit put it best in *United States v. $38,000,* 816 F.2d 1538, 1547 (11th Cir. 1987):

> Courts consistently have required claimants to follow the language of the Supplemental Rules to the letter. We see no reason to apply a less stringent standard

to the government when it seeks forfeiture. If anything, the burden on the government to adhere to the procedural rules should be heavier than on claimants. Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required.

*Accord, United States v. Estevez*, 845 F.2d 1409 (7th Cir.1988). Therefore, in general, proper service of process is a prerequisite to any objection from the government to the timeliness of a claim.

### B.

However, the government cites two forfeiture cases in which courts have held, in some circumstances, that a claimant cannot rely on defects in service where he has actual notice of the action. *E.g., United States v. $3,817.49*, 826 F.2d 785, 787 (8th Cir.1987); *United States v. One (1) 1979 Mercedes*, 651 F.Supp. 351 (S.D.Fla.1987). The parties jump from these holdings directly into a dispute over pinpointing the "actual notice" date. The government asserts that Lily knew of the action in January; she says July, and further that she did not understand the ramifications of the action until late August.

We think that the "actual notice" exception to proper service is narrower than the government suggests. In *$3,817.49*, the claimants, though not personally served, filed a timely claim. However, they failed to verify the claim or file an answer. In *One (1) 1979 Mercedes*, the claimant filed a timely answer but no verified claim. The courts in both cases concluded that the insufficiency of service was simply irrelevant to the claimant's failure to perfect his claim. In short, where a claimant has actual notice, enters the case in a timely fashion, and then makes a later default of some sort, he may not then complain of defects in process. *Cf.* Fed.R.Civ.P. 12(h)(1) (defense of insufficiency of process or of service of process is waived unless asserted in answer or Rule 12 motion). Lily has done anything but waive her defense of insufficiency of service.

The "actual notice" concept, however, may admit of proper application in some future case, so we will not reject it out of hand. We do think, however, that its application must necessarily be sparing, else it will sap all force from the heightened procedural protections we described above in Section II(A).

▪ In any event, the parties sharply dispute when Lily had "actual notice." The district court held no evidentiary hearing on the question, and we of course cannot resolve it. We need not remand for such a hearing, however, because we conclude below that Lily properly demonstrated "excusable neglect" for her failure to file her claim sooner.

### C.

Even where a claimant is properly served, or perhaps has "actual notice," a court may allow a claim to be filed out of time on a showing of excusable neglect. Fed.R.Civ.P. 6(b)(2). Forfeiture cases only rarely identify the same list of considerations in deciding whether a particular claimant's circumstances constitute "excusable neglect," most likely because the determination is equity-ridden, and the peculiar facts of each case involve different equities. Some of the factors courts have identified include: when the claimant became aware of the seizure, whether the claimant was properly served, whether the government would be prejudiced, whether the government encouraged the delay or misguided the claimant, whether the claimant informed the government and the court of his interest before the deadline, whether the claimant had expended resources preparing for trial, the claimant's good faith, the claimant's health problems, whether the government has complied with procedural rules, and whether the claimant was acting *pro se*. *See United States v. Dairy Farm*, 918 F.2d 310, 312 (1st Cir.1990); *United States v. $103,387.27*, 863 F.2d 555 (7th Cir.1988); *United States v. $149,345*, 747 F.2d 1278 (9th Cir.1984); *United States v. Tract of Land Described as Map 2535*, 726 F.Supp. 274 (D.Or.1989); *United States v. Various Parcels*, 650 F.Supp. 62

**754**

(N.D.Ind.1986); *United States v. Assets of Taylor*, 640 F.Supp. 35 (E.D.Va.1986), *aff'd*, 796 F.2d 475 (4th Cir.1986); *United States v. 1967 Mooney M20-F Aircraft*, 597 F.Supp. 531 (N.D.Ga.1983).

Among these, perhaps the most important is the degree of prejudice to the government. *$103,387.27*, 863 F.2d at 562. "Prejudice," though always identified as a factor, is rarely defined or applied. A rare exception is *United States v. White 1981 Race Corvette*, 704 F.Supp. 872, 878 (N.D.Ind.1989), where the government showed that it had incurred over $500 per month in expenses storing the seized automobile while the claimant failed to come forward.

It is perhaps more appropriate for our purposes to define what prejudice is not, rather than what it is. The government is not "prejudiced" solely because Lily's claim may turn out to be meritorious. The goal of a civil forfeiture action under 21 U.S.C. § 881 is that all fruits and instrumentalities of drug distribution crimes be forfeited, while preserving the rights of unwitting, innocent owners of such property. § 881(a)(6). The degree to which the government has achieved that goal is not measured by the value of the property forfeited. If Lily's claim is valid, and the government can restore her property to her while retaining what is properly forfeited, the action is a success; justice and congressional intent are satisfied.

We must conclude that the "excusable neglect" equities favor Lily. The government did not serve her by mail though it knew of her interest. When Lily tried to file her claim, the case was at a preliminary standstill—it had been stayed in its infancy pending resolution of the criminal charges and was months away from trial. Lily was geographically located a continent away. She relied to her detriment on the bank's representations, admittedly hearsay, that the government would not take her money. Stanley failed to return phone calls from Ross; if he had, Lily's claim would doubtless have been filed sooner. As we have emphasized, the government made no assertion of prejudice.

■ A district court's ruling on excusable neglect is reviewed for abuse of discretion. *$103,387.27*, 863 F.2d 555. We find an abuse here.

#### D.

The United States is the strongest and most important party that appears before us. It dwarfs all others in power, resources, and awesome responsibilities. On the other hand, it is a unique entity in that it cannot always act, as other parties may, in the naked self-interest of augmenting its pocketbook. When the government takes a position in litigation, it takes a position on behalf of the people, and "the people" usually, as here, includes the government's opponent in the litigation. The government as litigant has an independent interest in achieving justice, even to the point of "losing" a case.

The government of course need not sit back, forgive all defaults and procedural abuses, and allow itself to be prejudiced by its opponent's conduct. However, in this case, the government does not offer even a hint of an insinuation that it would have been unfairly prejudiced by Lily's intervention. In that light, we cannot applaud the government's efforts to deny appellant a hearing on the merits of her claim. Allowing Lily to file her claim is not giving her the money; all it entitles her to do is participate in the proceeding and prove that she had no knowledge of or did not consent to the crimes giving rise to the forfeiture. The government may still "win" the money, but it must let Lily into the courthouse.

The judgment is reversed, and the case is remanded with instructions to permit the filing of appellant's verified claim.

**REVERSED AND REMANDED.**

WILKINSON, Circuit Judge, concurring separately:

I agree with the result here, but I write separately because the majority has painted with a very broad brush.

I conclude with the majority that there is excusable neglect under the particular circumstances presented here. I base this

conclusion primarily on the ways in which the government made it more difficult for Lily to enter the forfeiture proceedings—particularly the government's failure personally to serve Lily ** (which deprived her of notification of the strict time limits provided in Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims) or even to return her divorce counsel's telephone calls. In addition, Lily was geographically distant and had never lived with her husband in West Virginia, where the alleged criminal activities occurred. There is also some indication that the administrator of the disputed assets at One Valley Bank had informed Lily's counsel that the government intended to release the funds to her. Finally, as the majority notes, the forfeiture action was stayed as of August 3 pending the outcome of the criminal proceedings against Abel. Because Abel was not convicted until September 19—and process was not served on the bank until October 29—it is unlikely that the forfeiture proceedings would have been delayed, or the government prejudiced, had Lily been allowed to file her claim in September.

I am uncomfortable, however, with the majority's statement that, among all factors properly considered by a court in deciding whether there is excusable neglect, "perhaps the most important is the degree of prejudice to the government." Maj. op. at 754. Placing primary importance on prejudice to the government inverts the proper course of analysis. The first stage in that analysis should be a determination, based on the actions of the government and those of the claimant, whether the claimant has a legitimate excuse for her failure to file in a timely fashion. The *last* step in the analysis—arrived at only *after* finding some reasons to excuse the failure—is an inquiry into whether allowing a late filing would prejudice the government. Whatever the equities in a particular case, the intent of Supplemental Rule C(6) plainly is that claimants who fail to timely file forfeit their claims unless they possess an adequate excuse—even when the government is in no way prejudiced. Allowing a late filing whenever the government would not be prejudiced would subvert the strict time limits established by Supplemental Rule C(6) and encourage claimants to litigate every untimely filing in a forfeiture case. Indeed, it would be an unusual case, particularly when the property involved is money, in which a filing that is untimely by only a short period would prejudice the government. Thus, the purpose of the strict time limits of Supplemental Rule C(6)—"requir[ing] claimants to come forward and identify themselves at an early stage of the proceedings," Advisory Committee Note to Supplemental Rule C—would be seriously undermined if excusable neglect were simply equated with an absence of prejudice to the government.

I am also troubled by the majority's characterization of forfeiture actions as "traditionally disfavored." Maj. op. at 752. Acts of Congress are not "disfavored." Congress authorized forfeiture for what it thought were good and sufficient reasons: that the threat of imprisonment was not

---

** The government's argument that it believed that Lily was no longer married to Abel is unavailing in light of the affidavit of an Assistant United States Attorney filed on April 11, 1990—after the government's service of notice by publication but before Lily or her attorney contacted the government in any way. That affidavit characterizes Lily as "his wife" and notes that Abel and Lily owned the house in Washington as joint tenants.

I am treating personal service in this context not as an inflexible requirement in forfeiture actions but as one among a totality of circumstances to be considered in a court's analysis of excusable neglect. Lack of personal service takes on particular significance in the present case because of the combination of circumstances presented: Lily was estranged from her spouse, not living with him; the government apparently knew—or could easily have determined—that she was still married to him; and the government knew—or could easily have determined—her address. In another case, lack of personal service may properly have little or no influence on a court's determination whether there is excusable neglect. And the role that lack of personal service plays in the excusable neglect calculus is entirely distinct from any constitutional questions raised by lack of personal service. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Robinson v. Hanrahan*, 409 U.S. 38, 93 S.Ct. 30, 34 L.Ed.2d 47 (1972) (*per curiam*).

sufficient to curb the drug trade and that seizure of the economic power base of criminal organizations and enterprises was necessary to effective enforcement of the drug laws. *See* S.Rep. No. 225, 98th Cong., 2d Sess. 191, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3374. Given this judgment by Congress, it is inappropriate for the courts to subvert the operation of the forfeiture action by imposing greater procedural or constitutional burdens on the government in forfeiture than in other cases.

I also find the David and Goliath imagery in part II(D) of the majority opinion problematic. How the government's resources, which are stretched across many cases, compare with those of private litigants is simply not relevant to an inquiry into excusable neglect. Supplemental Rule C(6) required only that Lily file a claim within certain time limits, and the government's resources, whatever their nature, stood as no impediment to her performance of that task.

Finally, if this case is to be resolved in part II(C) on the grounds of excusable neglect, I find the majority's discussion of actual notice in II(B) to be unnecessary. Even assuming that Lily had actual notice, she still would not be barred from presenting her claims to the property in question because of the majority's finding of excusable neglect. Because any discussion of actual notice is unnecessary to a decision based on excusable neglect, it seems the better course simply to assume that Lily had actual notice, and leave the constitutional questions for a case that squarely presents them.