UNITED STATES of America, Plaintiff,

v.

CONTENTS OF ACCOUNT NUMBER 901121707 in the Name of Han Kuk Kuen Young, Inc., at Korea First Bank, et al., Defendants-in-rem.

No. 98 Civ. 5416(RWS).

United States District Court, S.D. New York.

Feb. 16, 1999.

Honorable Mary Jo White, United States Attorney for the Southern District of New York, New York City (Gary Stein, Assistant U.S. Attorney, of counsel), for Plaintiff,

Samuel Weissman, New York City, for Defendants–in–rem.

*OPINION*

SWEET, District Judge.

Kil Young Maeng ("Maeng") has moved, on behalf of Han Kuk Kuen Young, Inc. ("Han Kuk") and Interlink Finance Co. ("Interlink"), for an enlargement of time to file a claim in this civil forfeiture action. For the reasons stated below, Maeng's motion is denied.

## Background

This action seeks the forfeiture of the contents of three bank accounts and $22,782.00 in United States currency (collectively, the "defendant-in-rem funds") seized by the Internal Revenue Service (the "IRS") in 1992 from Han Kuk and Interlink, two check cashing services controlled by Maeng. The verified complaint alleges that the defendant-in-rem funds (which aggregate approximately $210,000) constitute property involved in the transactions and attempted transactions in violation of the cash reporting and anti-structuring provisions of 31 U.S.C. §§ 5313(a) and 5324(a), and hence are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

According to the verified complaint, on July 17, 1997, a federal grand jury in the Southern District of New York returned an indictment charging Maeng with one count of conspiracy to violate 31 U.S.C. §§ 5313(a), 5322(b) and 5324(a)(3) and with eight substantive counts of violating 31 U.S.C. §§ 5313(a) and 5322(b). *See United States v. Kil Young Maeng*, S1 97 Cr. 645. The indictments alleged, among other things, that from 1988 to on or about July 17, 1992, Maeng, through his company Han Kuk, cashed checks for more than $10,000 on behalf of his customers in the garment industry without filing the required currency transaction reports ("CTRs") with the Federal Government. The indictment also alleged that on several occasions in July 1992, Maeng and Han Kuk cashed multiple checks from the same customer aggregating more than $10,000, even though each individual check was for less than $10,000, without filing the required CTRs. The indictment also contained a forfeiture allegation seeking forfeiture of all property involved in Maeng's violations of the currency reporting requirements of Title 31.

On February 27, 1998, Maeng executed a plea agreement (the "Plea Agreement") in which, among other things, Maeng admitted that the value of the funds involved in his currency reporting offense was more than $20 million. The Plea Agreement also resolved the Government's forfeiture claims against Maeng. The Plea Agreement states that "the defendant agrees to forfeiture, pursuant to Title 18, United States Code, Section 981(a)(1)(A)," of the three bank accounts and currency which constitute the defendant-in-rem funds in this action. (Plea Agreement at 1–2). Maeng further agreed "to take whatever steps are necessary to pass clear title [to the defendant-in-rem funds] to the United States." The parties stipulated that Maeng did not act with reckless disregard of the source of the funds, and that the funds were the proceeds of lawful activity and were used for a lawful purpose. Pursuant to the Plea Agreement, the Government dismissed all but one count against Maeng and agreed not to seek forfeiture of an additional two bank accounts that had been seized by the IRS.

On March 4, 1998, Maeng plead guilty to Count One of the Indictment before the Honorable Sonia Sotomayor. The issue of forfeiture was not addressed.

On July 29, 1998, in accordance with the Plea Agreement, the Government commenced the instant action, pursuant to 18 U.S.C. § 981(a)(1)(A), to forfeit the defendant-in-rem funds. The Government sent written notice of the commencement of this action, via certified mail, to Maeng, Maeng's criminal defense attorney, Mr. Anolik ("Anolik"), Han Kuk, and Interlink.

On or about August 2, 1998, Maeng and his daughter, Julia Maeng, met with Anolik in preparation for Maeng's sentencing. Ms. Maeng showed Anolik a newspaper article discussing the Supreme Court's recent ruling in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). According to Maeng, Anolik indicated that he would research the issues arising from the *Bajakajian* decision and raise them at Maeng's sentencing. Anolik also advised Maeng that the forfeiture was separate from the original criminal case, and requested an additional retainer fee.

On August 13, 1998, Judge Sotomayor sentenced Maeng to one year of probation, a $250 fine, and a $50 special assessment. The *Bajakajian* decision was not mentioned, and Maeng did not indicate in any way to the Government or to Judge Sotomayor that he

intended to contest the forfeiture which had been specifically agreed to in the Plea Agreement.

On September 1, 1998, Maeng retained new counsel. On September 7, 1998, the Government received a letter from Maeng's counsel proposing a "modification" of the terms of the Plea Agreement and suggesting a "settlement" of the matter. The Government responded in a letter dated September 11, 1998, rejecting Maeng's proposed "settlement" and stating that the Government would oppose any effort by Maeng to file a claim in this action in light of the Plea Agreement.

Maeng submitted a letter to the Court on October 5, 1998, requesting permission to file a late claim. In a letter to the Court dated October 13, 1998, the Government opposed Maeng's request based, in part, on the fact that in Maeng had agreed to forfeiture of the relevant funds as part of the Plea Agreement. The parties appeared before the Court on October 14, 1998, at which time the Government agreed that Maeng should be permitted to file papers in support of his motion to file a late claim.

On October 23, 1998, Maeng filed the instant motion for an order *nunc pro tunc* enlarging the time to file a Notice of Claim. Oral argument was heard on November 18, 1998, at which the time the motion was deemed fully submitted.

## Discussion

### I. *Maeng's Proposed Claim*

Maeng's proposed verified claim seeks a determination of whether forfeiture of the entire amount of money in the civil action would be grossly disproportional to the gravity of the offense and thus unconstitutional under the Excessive Fines Clause, as analyzed by the Supreme Court in *Bajakajian*.

1. Rule C(6) provides in relevant part:
    The claimant of property that is the subject of an action in rem shall file a claim within ten days after process has been executed, or within such additional time as may be allowed by the court, and shall serve an answer within 20

### A. *Timeliness*

Civil forfeiture actions pursuant to 18 U.S.C. § 981 are governed by the Supplemental Rules for Certain Admiralty and Maritime Claims. The Government contends that Maeng lacks standing to contest the forfeiture because he has not complied with Supplemental Rule C(6) which requires that a claimant in a forfeiture proceeding file a sworn notice of claim within ten days from receipt of notice of the commencement of a civil forfeiture action.[1] The Government is correct that if no claim is properly filed, a putative claimant lacks standing to contest forfeiture of the property. *See e.g., United States v. Approximately 2,538.85 Shares of Stock*, 988 F.2d 1281 (1st Cir.1993); *United States v. Eng.*, 951 F.2d 461, 468 (2d Cir. 1991); *see also Ortiz–Cameron v. Drug Enforcement Administration*, 139 F.3d 4, 6 ("If a putative claimant who has received proper notice fails to file within Rule C(6)'s time limits, he or she may not bring a future claim for the properties at issue."). The purpose behind Rule C(6) is "to require claimants to come forward as quickly as possible after the initiation of forfeiture proceedings, so that the court may hear all interested parties and resolve the dispute without delay." *United States v. Various Computers and Computer Equipment*, 82 F.3d 582, 585 (3d Cir.1996).

"Strict compliance with Supplemental Rule C(6) is typically required." *United States v. Amiel*, 995 F.2d 367, 371 (2d Cir. 1993); *see also, United States v. Beechcraft Queen Airplane*, 789 F.2d 627, 630 (8th Cir. 1986) (district court did not abuse its discretion in striking answer that was not preceded by verified claim); *United States v. 218 Panther Street*, 745 F.Supp. 118, 120 (E.D.N.Y. 1990) (claimant lacks standing to contest forfeiture because he did not timely file claim and answer). A claimant in a civil forfeiture action may file a late claim upon a showing of "excusable neglect" under Federal Rule of Civil Procedure 6(b)(2). *See United States v. Borromeo*, 945 F.2d 750, 753 (4th Cir.1991);

days after the filing of the claim. The claim shall be verified on oath or solemn affirmation, and shall state the interest in the property by virtue of which the claimant demands its restitution and the right to defend the action.

*United States v. All Assets of Blue Chip Coffee, Inc.,* 836 F.Supp. 104, 108 (E.D.N.Y. 1993). In applying this standard, courts have emphasized the equitable and fact-specific nature of the inquiry, and have examined such factors as the reasons for the prospective claimants delay, the prospective claimants good faith, whether the Government encouraged the delay, whether the prospective claimant was proceeding *pro se,* whether the prospective claimant advised the Government of its interest in the defendant-in-rem before the claim deadline, and whether the Government would be prejudiced by allowing the later filing. *See Borromeo,* 945 F.2d at 753–54; *United States v. $10,000.00 in United States Funds,* 863 F.Supp. 812, 814 (S.D.Ill.1994); *United States v. $175,-918.00 in United States Currency,* 755 F.Supp. 630, 633 (S.D.N.Y.1991).

■ Here, Maeng, Han Kuk and Interlink received notice of the forfeiture action on July 31, 1998, giving Maeng until August 10, 1998 to file a claim. Maeng has failed to establish that his failure to file a timely claim in this action under Supplemental Rule C(6) was the product of "excusable neglect." Maeng had promised in the Plea Agreement that he would forfeit the funds at issue in this action. Maeng was on notice by July 31, 1998 that the Government had commenced this action pursuant to the Plea Agreement. He had also, by this time, become aware of the Supreme Court's decision in *Bajakajian.* The *Bajakajian* decision was issued on June 22, 1998. Maeng admits that during his August 2, 1998 meeting with Anolik, they discussed whether there "may be an opportunity to challenge the forfeiture," not withstanding the Plea Agreement, in light of the Supreme Court's ruling in *Bajakajian.* (Maeng Aff. ¶ 17).[2] Yet, Maeng did not apprise the Government of

his intent to contest the forfeiture until September 7, 1998.[3]

Relying on *United States v. $175,918.00 in United States Currency,* 755 F.Supp. 630 (S.D.N.Y.1991), Maeng asserts that he has "done all that he could reasonably be expected to do." *Id.* at 633. However, unlike Maeng, the claimant in *United States v. $175,918.00 in U.S. Currency,* had not agreed to forfeit the defendant-in-rem funds as part of a plea agreement. Moreover, he was incarcerated and was proceeding *pro se.* Despite these obstacles, the Court found that the claimant had been "diligent in pursuing his rights throughout the litigation." [4]

Maeng claims that his failure to file a timely claim was the product of his attorney's negligence and ignorance with respect to the time within which a claim must be filed. Specifically, Maeng avers that he "underst[ood]" from Anolik's associate that he had "at least" 30 days to file a claim. (Maeng Aff. ¶ 18). Courts have consistently held, however, that such claims do not constitute the kind of "excusable neglect" required to permit the filing of an untimely claim in a civil forfeiture action. *See e.g., United States v. Property Identified As $88,260.00 in United States Currency,* 925 F.Supp. 838, 843 (D.D.C.1996) (counsel's ignorance of the applicable rules and misinterpretation of the law is not excusable neglect or mistake); *United States v. A Parcel of Real Property,* 724 F.Supp. 1081, 1083 (E.D.N.Y.1988) (prospective claimants' assertion that they were in "a state of complete confusion" because they were consulting with criminal defendant's attorney rather than their own "does not ... constitute a valid excuse for their failure to comply with Rule C(6)"); *United States v. Premises Known as Lots 14, 15, 16, Etc.,* 682 F.Supp. 288, 290 (E.D.N.C.1987) ("Mere ignorance or unfamiliarity with the law is clearly inadequate, especially since the

---

**2.** Julia Maeng avers that she first discussed the *Bajakajian* decision with her father on June 23, 1998, and faxed a copy of the decision to Anolik's office on June 25, 1998. (Julia Maeng Aff. ¶¶ 3–4).

**3.** While it is not clear from this record, the Government may have received some indication of Maeng's intention to challenge the forfeiture on August 31, 1998, when Julia Maeng tele-

phoned Assistant United States Attorney Gary Stein.

**4.** In *United States v. $175,918.00 in U.S. Currency,* the Government commenced the forfeiture action on May 23, 1989. The claimant notified the Government and the Court of his intent to contest the forfeiture on June 6, 1989.

necessity of filing a claim is clear from a reading of Supplemental Rule C(6)").

Maeng asserts that the Government would not be prejudiced by allowing the late filing of a verified claim. The Government counters that having fully performed its obligations under the Plea Agreement, it would be affirmatively prejudiced if Maeng were now allowed to assert a late claim that "should have been asserted at a time before Maeng was sentenced in his criminal case." The Government's assertion is compelling. Even if the Government was not prejudiced by Maeng's post sentencing change of position, "[a]llowing a late filing whenever the government would not be prejudiced would subvert the strict time limits established by Supplemental Rule C(6) and encourage claimants to litigate every untimely filing in a forfeiture case." *Borromeo,* 945 F.2d at 755 (J. Wilkinson, concurring).

Accordingly, Maeng's motion to file a late claim is denied.[5]

### Conclusion

For the reasons stated above, Maeng's motion is denied.

It is so ordered.

---

5. Even if Maeng's claim had been timely filed, it appears to be without merit under a *Bajakajian* analysis. In *Bajakajian,* the Supreme Court held that once it is established that a forfeiture is a fine within the meaning of the Eighth Amendment, a gross disproportionality test must be applied to determine constitutional excessiveness, that is "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Bajakajian,* 118 S.Ct. at 2036. In the present action, the aggregate value of the defendant-in-rem funds is approximately $210,000. Maeng stipulated in the Plea Agreement that the value of the funds involved in Maeng's criminal offense was more than $20 million. The forfeiture thus represents roughly 1% of the total currency involved in Maeng's illegal transactions. In *Bajakajian,* by contrast, the Government sought forfeiture of all of the funds involved in the criminal offense.