LUCENT TECHNOLOGIES, INC., Plaintiff,

v.

LUCENTSUCKS.COM, Defendant.

No. CIV. A. 99–1916–A.

United States District Court, E.D. Virginia, Alexandria Division.

May 3, 2000.

Robert M. Newbury, Pattishall, McAuliffe, Newburg, Hilliard & Geraldson, Chicago, IL, Roy G. Decker, Jr., Stauffer, Mannix, Rommel, Decker & Dulany, LLC, McLean, VA, for Plaintiff.

John S. Fogel, Los Angeles, CA, James W. Pravel, Pravel Intellectual Property Law, P.C., Alexandria, VA, for Defendant.

### MEMORANDUM OPINION

BRINKEMA, District Judge.

Before the Court is the Motion of Defendant lucentsucks.com's [sic] to Dismiss the Complaint, in which defendant argues that plaintiff's failure to comply with the requirements of the recently enacted Anti–Cybersquatting Consumer Protection Act mandates dismissal of the complaint. For the reasons stated below, the motion will be granted.

### I. BACKGROUND

Plaintiff Lucent Technologies, Inc. is a Delaware Corporation with its principal place of business in Murray Hill, New Jersey. It has filed this *in rem* action against the domain name lucentsucks.com under the Anti–Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125.

Plaintiff alleges that, on November 30, 1995, its predecessor filed an application with the United States Patent and Trademark Office ("PTO") to register LUCENT as a trademark. Since 1996, plaintiff has manufactured, marketed and sold telecommunications equipment and services under the marks LUCENT and LUCENT TECHNOLOGIES. It has registered and applied to register LUCENT marks with the PTO for a variety of goods and services. Plaintiff alleges that the money and effort it has expended on advertising and promoting its products and services under these marks has created valuable goodwill in the marks.

According to plaintiff, on August 2, 1998, Russell Johnson registered the domain name lucentsucks.com through Network Solutions, Inc. ("NSI"), located in Herndon, Virginia. Plaintiff alleges that the website at this domain name contains pornographic photographs and services for sale.

Plaintiff advances two causes of action: Count I, Trademark Infringement, 15 U.S.C. § 1114(1) and 15 U.S.C. § 1125(a); and Count II, dilution, Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c). Plaintiff seeks court order directing NSI to transfer registration of lucentsucks.com to Lucent.

### II. DISCUSSION

Lucentsucks.com raises several arguments in support of its argument to dismiss the complaint: plaintiff did not satisfy the *in rem* jurisdictional requirements of the ACPA; an internet domain name is not "property," for purposes of obtaining *in rem* jurisdiction; and First Amendment principles would be violated if plaintiff could force forfeiture of defendant domain name. We find for the reasons discussed below that plaintiff failed to satisfy the jurisdictional requirements of the ACPA, and therefore will dismiss the complaint on that basis. Because the ACPA is a new statute, and is still the source of some confusion, we also briefly address some of defendant's other arguments.

#### A. The ACPA

On November 29, 1999, the Anticybersquatting Consumer Protection Act ("ACPA"), Pub.L. No. 106–113, 113 Stat. 1501 (codified as amended at 15 U.S.C. §§ 1114, 1116, 1117, 1125, 1127, 1129 (1999)), went into effect as an amendment to the Trademark Act. Congress enacted the ACPA to address the growing phenomenon of "cyberpiracy or cybersquating," which involves "registering, trafficking in, or using domain names (Internet addresses) that are identical or confusingly similar

to trademarks with the bad-faith intent to profit from the goodwill of trademarks." H.R.Rep. No. 106–412, at 7 (1999).[1]

Supporters of the ACPA were particularly concerned about anonymous trademark violators on the Internet. That is, they were troubled by the increasing trend of individuals registering domain names in violation of trademark rights and then eluding trademark enforcement because they could not be found. The Senate Judiciary Committee observed:

> A significant problem faced by trademark owners in the fight against cybersquatting is the fact that many cybersquatters register domain names under aliases or otherwise provide false information in their registration applications in order to avoid identification and service of process by the mark owner.

Sen. Rep. No. 106–140, at 4 (1999). The Judiciary Committee believed that including an *in rem* provision in the ACPA would alleviate the problem of anonymous cybersquatters, by allowing a mark owner to file an action against the domain name itself, provided it satisfied the court that it exercised due diligence in trying to locate the owner of the domain name but could not do so. *Id.*

### B. Plaintiff's Efforts to Comply with the In Rem Provision

Once plaintiff learned of lucentsucks.com, its in-house counsel sought the name and address of the registrant for that domain name from NSI, the registry.

NSI's records showed a registrant by the name of Russell Johnson. On November 11, 1999, plaintiff's in-house counsel sent a letter via Federal Express to Johnson at the address listed with NSI. In it, plaintiff demanded that Johnson "immediately cease and desist from engaging in or permitting any further or future use of the Lucent Marks ..." (Opp. to Def. Ex. D.) The letter was returned by Federal Express as undeliverable.

Plaintiff contacted NSI to determine whether Johnson had changed his address on the lucentsucks.com registration. Although NSI's agreement with registrants requires that they maintain current mail and e-mail addresses,[2] no changes of address were noted for Johnson. Plaintiff then sent another demand letter on December 8, 1999, to the addresses listed with NSI. This letter, however, was sent first class United States Postal Service mail and e-mail. In the letter, plaintiff referred to the *in rem* provision of the just-enacted ACPA:

> Because we have not been able to reach you, Lucent Technologies Inc. intends to proceed with filing an in rem civil action against your domain name registration Lucentsucks.com pursuant to Section 43(d)(2)(A) of the Lanham Act, 15 U.S.C. § 1125(d)(2)(A).

(Opp. to Def. Ex. E.) The e-mail was returned as undeliverable. However, the letter sent via first class mail was successfully delivered to Johnson. The record

---

1. The House found that cyberpiracy can be damaging to businesses in a number of ways:

   First, a cyberpirate's expropriation of a mark as part of a domain name prevents the trademark owner from using that mark as part of its domain name. As a result, consumers seeking a trademark owner's Web site are diverted elsewhere, which means lost business opportunities for the trademark owner. A cyberpirate's use may also blur the distinctive quality of the mark and, when linked to certain types of Internet activities such as pornography, may also tarnish the mark. Finally, businesses are required to police and enforce their trademark rights by preventing unautho-

   rized use, or risk losing those rights entirely.
   H.R.Rep. No. 106–412, at 6 (1999).

2. Under the subheading "Accurate Information," the NSI contract provides:

   As further consideration for the Network Solutions service(s) you agree to: (1) provide certain current, complete and accurate information about you as required by the application process; and (2) maintain and update this information as needed to keep it current, complete and accurate.
   *http://www.networksolutions.com/legal/service-agreement.html*

shows that Johnson had moved after registering the domain name with NSI, and that he left a forwarding address with the United States Postal Service ("U.S.P.S").

On December 16, 1999, eight days after the second demand letter was mailed and e-mailed, plaintiff filed this action. On December 21, 1999, thirteen days after the second demand letter was sent, Johnson called Lucent's outside counsel. Counsel informed Johnson that an *in rem* suit had been filed, and Johnson provided counsel a pager number. On December 22, 1999, Johnson called counsel again, allegedly asking for money in exchange for releasing the domain name. Counsel called Johnson later that day to reject the offer. Johnson gave counsel his new address during that call, and counsel sent a copy of the complaint to that address.

Although plaintiff now knew the location of the registrant, it continued to prosecute its *in rem* action under the ACPA. Plaintiff moved for Entry of Order to Publish

Notice of Action on January 7, 2000. The ordered was entered and plaintiff published a notice of the action in *The Washington Post* for two consecutive weeks. It also mailed copies of the Order and the complaint to registrant's address as provided by NSI and as provided by Johnson. Plaintiff filed an affidavit of compliance on February 11, 2000.

### C. Plaintiff has not Satisified the Requirements of the In Rem Provision

■ By the express terms of Section 1125(d)(2)(A)(ii) of the ACPA, a plaintiff may proceed with an *in rem* action against a domain name if and only if the Court finds [3] either that the plaintiff is unable to obtain *in personam* jurisdiction over the domain name registrant, or that the plaintiff is unable to find the domain name registrant.[4] Plaintiff does not base *in rem* jurisdiction on an inability to assert *in personam* jurisdiction.[5] Instead, it rests

---

**3.** Therefore, the authority cited in Plaintiff's Supplemental Memorandum in Opposition to Motion to Dismiss, for the principle that subsequent events cannot divest the court of jurisdiction once it attaches, is irrelevant. By the terms of Section 1125(d)(2)(A)(ii), jurisdiction does not attach absent findings by the Court that plaintiff complied with the *in rem* provision.

**4.** The *in rem* provision, in its entirety, provides:

The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if—
(i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) and (c); and
(ii) the court finds that the owner—
(I) is not able to obtain in personam jurisdiction over a person who would have been a defendant and in a civil action under paragraph (1); or
(II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) by—

(aa) sending a notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; and
(bb) publishing notice of the action as the court may direct promptly after. filing the action.
15 U.S.C. § 1125(d)(2)(A).

**5.** 15 U.S.C. § 1125(d)(2)(A)(ii)(I). This subsection was the basis for an *in rem* action asserted in an earlier case before this Court, *Ceasars World, Inc. v. Ceasars–Palace.com*, No. 99–550–A (E.D. Va. filed Mar. 3, 2000). Because the subsection is not at issue here, plaintiff's reliance on *Ceasar's World* is improper. Morever, we note that Section 1125(d)(2)(A)(ii)(I) was devised by Congress to provide remedies for trademark owners where domain names infringing on their marks are registered to foreign entities over whom *in personam* jurisdiction is unattainable. *See* H.R. Rep. 106–412, at 9 (1999). That is not the case here. In our case, it is undisputed that Russell Johnson is a California resident who registered the domain name lucentsucks.com with NSI, which has its principal place of business in Herndon, Virginia. This "minimum contact" is sufficient to satisfy due process as well as to support *in personam* jurisdiction over Johnson pursuant to the

its case on Section 1125(d)(2)(A)(ii)(II), which states, in pertinent part:

The owner of a mark *may* file an in rem civil action against a domain name in the judicial district in which the domain name registrar ... that registered or assigned the domain name is located if... (ii) *the court finds* that the owner... (II) through *due diligence* was not able to find a person who would have been a defendant in a civil action under paragraph (1) by-(aa) *sending notice* of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar; *and* (bb) publishing notice of the action as the court may direct promptly after filing the action.

15 U.S.C. § 1125(d)(2)(A)(emphasis added).

We find that, based on the allegations in plaintiff's complaint, Russell Johnson, the listed registrant of defendant lucentsucks.com would be "a person who would have been a defendant in a civil action under paragraph (1)."[6] Therefore, proceeding any further *in rem* is not appropriate. We also find that plaintiff failed to satisfy the due diligence clause, Section 1125(d)(2)(A)(ii)(II)(aa), because it did not allow a reasonable time for Johnson to respond to its December 8, 1999 notice before filing the *in rem* complaint.

#### 1. Due Process Requires Reasonable Time

Plaintiff's counsel waited only eight days between sending the December 8, 1999 letter via mail and e-mail and filing this action. Plaintiff contends that these actions satisfied the express terms of the ACPA *in rem* provision and should there-

fore the complaint should go forward. However, to find, as plaintiff urges, that an eight-day waiting period between sending notice of an intent to proceed *in rem* and filing an *in rem* action, is sufficient, would run afoul of Due Process. It is true that Congress did not specify the waiting period. In the face of this ambiguity, we must interpret the ACPA *in rem* provision consistently with Due Process requirements. *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 500, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) ("an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available"). Furthermore, for an *in rem* action to proceed pursuant to Section 1125(d)(2)(A)(ii)(II), the ACPA requires the Court to find that plaintiff used "due diligence" when attempting to notify registrant. 15 U.S.C. § 1125(d)(2)(A)(ii)(II). We find that a waiting period of merely eight days does not demonstrate the requisite "due diligence."

The seminal case addressing the notice aspect of procedural Due Process is *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In it, the Supreme Court observed:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.... The notice must of be such nature as reasonably to convey the required information, and *it must afford a reasonable time for those interested to make their appearance.*

*Id.* at 314, 70 S.Ct. 652 (citations omitted) (emphasis added); *see United States v.*

Virginia Long Arm statute. Va.Code § 8.01–328.1.

**6.** The pertinent language of paragraph(1) is: *A person shall be liable in a civil action* by the owner of a mark ... if ... that person

(i) has a bad faith intent to profit from that mark ... and (ii) registers, traffics in, or uses a domain name that[poses trademark violations].
15 U.S.C. § 1125(d)(1)(A) (emphasis added).

*James Daniel Good Real Prop.,* 510 U.S. 43, 53, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("right to prior notice and a hearing is central to the Constitution's command of due process"). This circuit mandates diligent enforcement of Due Process requirements in connection with *in rem* forfeiture proceedings such as this. *United States v. Borromeo,* 945 F.2d 750, 752 (4th Cir.1991) ("[d]ue process protections ought to be diligently enforced, and by no means relaxed, where a party seeks the traditionally-disfavored remedy of forfeiture").

There are few cases specifically addressing what length of time is a "reasonable time" between notification of a possible or pending court action and the action.[7] However, we are certain that eight days is insufficient. The notice provided must be more than "mere gesture." *Mullane,* 339 U.S. at 315, 70 S.Ct. 652. We note that potential parties to a court action share the same tendency as the rest of us to take vacations of two weeks or more without leaving a forwarding address, and that, when they make a permanent change of residence, mail forwarded by the United States Postal Service arrives more slowly than mail addressed directly to the new residence.[8] Furthermore, the Due Process requirements contemplate the time reasonably necessary to digest the notice and to find an attorney. *See Grunin v. International House of Pancakes,* 513 F.2d 114, 121 (8th Cir.1975) (due process satisfied where notice of proposed settlement was mailed to class members 19 days before hearing, especially in light of "continuing notice" afforded members because litigation was two years ongoing and *all counsel* appearing at earlier settlement hearing were kept informed of all subsequent developments in case).

### 2. Other Statutes Provide a Waiting Periods of at Least Ten Days

Where Congress has specified a waiting period by statute in situations analogous to the ACPA *in rem* provision, ten days is the shortest amount of time specified. Perhaps the statutory provision most analogous to the provision at issue is Rule C of the Federal Rules of Civil Procedure, which allows an *in rem* action "to enforce any maritime lien" or whenever a federal statute provides for "a maritime action in rem or a proceeding analogous thereto." Fed.R.Civ.P. C(1). The rule permits the claimant of property that is subject to an *in rem* action 10 days after the rem has been seized to file a claim and 20 days after that to serve an answer. Fed. R.Civ.P. C(6). In the standard *in personam* action, Rule 12 of the Federal Rules of Civil Procedure allows 20 days after service of process to file an answer. Fed. R.Civ.P. 12(a)(1)(A).

---

7. *See Bradford v. Edelstein,* 467 F.Supp. 1361, 1372 (S.D.Tex.1979) (customers' Due Process rights violated where utility board allowed only 24 hours between notice of proposed disconnection of phone services and actual disconnection); *see also Air Lines Stewards and Stewardesses Assoc. v. American Airlines, Inc.,* 455 F.2d 101, 108 (7th Cir.1972) (in class action, class members were afforded a "reasonable time" of 30 days between sending the notice of a hearing and the hearing).

8. Although we can find no legal authority acknowledging, in the context of Due Process notice requirements, that it takes time to forward mail, the Third Circuit made an analogous observation in *Greenfield v. Villager Indus., Inc.,* 483 F.2d 824 (3d Cir.1973). The *Greenfield* Court found a denial of Due Process in a class action under the federal securities laws where only 30 days elapsed between sending notice to absentee class members and their deadline to file proofs of claim:

> We have a serious problem with the limited period of time in which shareholders were permitted to file proofs of claim or requests for exclusion.... [P]ro forma gestures will not suffice.... Appellants present a reasonable argument that the thirty-day period was insufficient for those members of the class who had left their stock in street names with their stockbrokers. A one-month period hardly seems sufficient time for brokerage firms to search their records, notify customers, probably by mail, for whom they held shares in street name, received instructions from these customers, again probably by mail, and file the proofs of claim or request for exclusion.

*Id.* at 833–34.

Neither Rule C nor Rule 12 are directly on point. In our case, we are considering what notice is required before an *in rem* action is instituted, and how long a plaintiff must wait to file an *in rem* action after sending notice by mail and e-mail, which may or may not reach the addressee. In contrast, Rule C specifies the waiting period *after* an *in rem* action is instituted, and Rule 12 specifies a waiting period after service of process is complete, that is, after actual notice has occurred. Nevertheless, taken together, these rules strongly suggest that Congress would not consider eight days to be a sufficient waiting period after mailing notice of a potential *in rem* action to a person who may be affected by that action.

### 3. *Congress Prefers In Personam Jurisdiction*

Our holding is consistent with the Congressional intent behind the *in rem* provision of the ACPA. The legislative history clearly shows that Congress enacted the provision to provide a last resort where *in personam* jurisdiction is impossible, because the domain name registrant is foreign or anonymous. Congress did not intend to provide an easy way for trademark owners to proceed *in rem* after jumping through a few *pro forma* hoops.

At least in part, Congressional concern for the Due Process rights of domain name registrants was inspired by this court's decision in *Porsche Cars North America, Inc. v. Porsh.Com*, 51 F.Supp.2d 707 (E.D.Va.1999). In *Porsche*, Judge Cacheris highlighted the important constitutional distinction between suing the domain name registrant *in personam* and not being able to find the registrant, in which case, one may proceed *in rem:*

> Porsche correctly observes that some of the domain names at issue have registrants whose identities and addresses are unknown and against whom in personam proceedings may be fruitless. But most of the domain names in this case have registrants—whose identities

and addresses are known, and who rightly would object to having their interests adjudicated in absentia. The Due Process Clause requires at least some appreciation for the differences between these two groups, and Porsche's pursuit of an in rem remedy that fails to differentiate between them at all is fatal to the Complaint.

*Id.* at 712 (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 317–18, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Senator Leahy quoted the above language when he introduced the current *in rem* provisions of ACPA and commented:

> The [*Porsche*] court held that in rem actions against allegedly diluting marks are not constitutionally permitted without regard to whether in personam jurisdiction may be exercised.

> .  .  .  .  .

> This legislation does differentiate between those two different categories of domain name registrants and limits in rem actions to those circumstances where in personam jurisdiction cannot be obtained.

145 Cong. Rec. S14,986–03, S15,026 (daily ed. Nov. 19, 1999) (statement of Sen. Leahy).

In our case, the identity and address of the registrant of the offending domain name, lucentsucks.com, has been found timely and *in personam* jurisdiction is possible. This is not the scenario envisioned by Congress when it enacted the *in rem* provision. Therefore, plaintiff is not entitled to proceed with this action.

### D. *Defendant's Other Arguments*

Besides failure to satisfy the *in rem* provision, defendant argues that the complaint should be dismissed because a domain name is not "property" justifying *in rem* jurisdiction, and plaintiff's action is an affront to free speech rights.

## 1. Domain Names are Property

■ Defendant contends that an Internet domain name is not a "thing," in the same way that a boat or a bridge is a "thing," because it does not occupy space or exist in a particular place. Therefore, according to defendant, a domain name cannot constitute a "res" for purposes of establishing *in rem* jurisdiction.

This argument has been raised before with regard to the ACPA, and we find Judge Bryan's articulate rejection of it beyond reproach:

> There is no prohibition on a legislative body making something property. Even if a domain name is no more than data, Congress can make data property and assign its place of registration as its situs.

*Ceasars World, Inc. v. Ceasars-Palace.com*, No. 99–550–A, at 5 (E.D. Va. filed Mar. 3, 2000).

## 2. Domain Names Signaling Parody Suggest Absence of Likelihood of Confusion and Bad–Faith Intent

Defendant maintains that dismissal of this complaint is also warranted because, as a matter of law, plaintiff could not make out a violation of trademark rights without infringing the registrant's free speech rights. We need not rule on this argument, because we have found other grounds for dismissal. Nevertheless, we note that defendant's position has some merit.

■ The likelihood of confusion is a key element when determining whether trademark infringement or dilution has occurred. *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir.1997) (plaintiff must show that it has a valid trademark and that the defendant's reproduction, counterfeit, copy, or colorable imitation of it creates a likelihood of confusion). The Fourth Cir-

cuit has acknowledged that effective parody "diminishes any risk of consumer confusion," and can therefore not give rise to a cause of action under the Trademark Act. *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 321 (4th Cir.1992). Defendant argues persuasively that the average consumer would not confuse lucentsucks.com with a web site sponsored by plaintiff.

■ Moreover, no civil action for trademark infringement or dilution lies under the ACPA unless the registrant's bad faith intent is demonstrated. 15 U.S.C. § 1125(d)(1)(A)(i). Courts may consider nine factors when determining whether a bad faith intent exists, including "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." 15 U.S.C. § 1125(B)(i)(IV). The House Judiciary Committee explained that this provision is intended to:

> [B]alance the interests of trademark owners with the interests of those who would make the lawful noncommercial or fair uses of others' marks online, such as in comparative advertising, *comment, criticism, parody*, newsreporting, etc.... The fact that a person may use a mark in a site in such a lawful manner may be an appropriate indication that the person's registration or use of the domain name lacked the required element of bad-faith.

H.R.Rep. No. 106–412, at 9 (1999) (emphasis added). As one federal court has explained, " 'sucks' has entered the vernacular as a word loaded with criticism." *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161, 1164 (C.D.Cal. 1998) (granting summary judgment to defendant website designer on claims brought pursuant to the Trademark Act, where defendant registered the domain name ballysucks.com).[9] A successful

---

9. Registering domain names in the form of [company name]sucks.com to provide a forum for critical commentary is not uncommon, and is part of an Internet phenomenon known as "cybergriping." *See* Greg Farrell, *From Sour Grapes to Online Whine*, USA To-

showing that lucentsucks.com is effective parody and/ or a cite for critical commentary would seriously undermine the requisite elements for the causes of action at issue in this case.

### III. CONCLUSION

Because we find that plaintiff instituted this *in rem* action too hastily after mailing and e-mailing the notice of a proposed *in rem* action to the registrant of lucentsucks.com, we cannot make the necessary prerequisite findings to permit an *in rem* action to proceed pursuant to Section 1125(d)(2)(A)(ii)(II) of the ACPA. Therefore, defendant's motion will be granted, and plaintiff's *in rem* action will be dismissed by an appropriate order.

The Clerk is directed to forward copies of this Memorandum Opinion to counsel of record.

day, April 6, 2000, at 01B (man spends $100,-000 to register domain names of over 500 of world's largest companies plus sucks.com suffix, "a traditional Web addendum to identify a site for complaints"); Thomas E. Anderson, *Emerging Intellectual Property Issues in Cyberspace,* 78 Mich. B.J. 1260, 1263 (1999) ("Cybergripers are websites dedicated to criticizing a person, product, or business").