**STANDING STONE MEDIA, INC. d/b/a Indian Country Today, Plaintiff,**

v.

**INDIANCOUNTRYTODAY.COM, Indiancountrytoday.net, and Indiancountrytoday.org, Defendant.**

No. 00–CV–874.

United States District Court, N.D. New York.

March 20, 2002.

Mackenzie Smith Lewis Michell & Hughes, L.L.P., Attorneys for Plaintiff, Syracuse, NY, Peter D. Carmen, Esq., of Counsel.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### I. INTRODUCTION

Standing Stone Media d/b/a *Indian Country Today* ("Standing Stone") filed this *in rem* action on June 6, 2000, pursuant to the "Anticybersquatting Consumer Protection Act" ("ACPA"), 15 U.S.C. § 1125(d)[1], after Miles Morrisseau, a former employee, registered the defendant internet domain names—<indiancountrytoday.com>, <indiancountrytoday.net>, *and* <indiancountrytoday.org>—in which Standing Stone asserts trademark ownership, in his own name. Presently before the Court is a motion by Standing Stone for an order waiving publication of this action under 15 U.S.C. § 1125(d)(2)(A)(ii)(II)(bb), and for summary judgment pursuant to Rule 56 of the Fed. R. Civ. P.. Standing Stone asserts that it has established all of the required elements of a claim under the ACPA and, therefore, is entitled to an order of this Court directing transfer of the subject domain names from Mr. Morrisseau to it. Mr. Morrisseau has neither appeared in this action to date nor formally opposed plaintiff's motion.

### II. FACTUAL AND PROCEDURAL BACKGROUND

According to plaintiff, *Indian Country Today* is a well-known and highly respected Native American newspaper which was founded in 1981. The newspaper was originally named the *Lakota Times*, and was first published under the name *Indian Country Today* on October 8, 1992. In December 1998, Standing Stone purchased *Indian Country Today* together with the

trademark *Indian Country Today* and began publishing the newspaper from its headquarters in Canastota, New York. By the time Standing Stone purchased *Indian Country Today*, the newspaper had become a national paper with news bureaus throughout the country. The circulation of *Indian Country Today* has continued to expand steadily since that time. Today, *Indian Country Today* is distributed throughout the United States and in 15 foreign countries. Standing Stone employs editors and reporters throughout the entire United States and maintains a fully functional news bureau in Washington, D.C., to cover national legislative and judicial issues.

To expand the circulation of *Indian Country Today*, Standing Stone developed a website at considerable expense to house an on-line edition of *Indian Country Today*. This website is currently accessed through Standing Stone's registered domain name, <indiancountry.com>. In January 2000, *Indian Country Today's* management team decided to register additional domain names on behalf of Standing Stone using its trademark *Indian Country Today*. Specifically, Standing Stone decided to register <indiancountrytoday.com>, <indiancountrytoday.net> and <indiancountrytoday.org> to house its on-line edition of *Indian Country Today*.

At the time Standing Stone decided to register the additional domain names, Miles Morrisseau was the editor-in-chief of *Indian Country Today*, working out of the company's Canastota, New York, office. Morrisseau was "an active participant" in

---

1. The ACPA was passed and signed into law on November 29, 1999, to:

 protect consumers and American businesses, to promote the growth of online commerce, and to provide clarity in the law for trademark owners by prohibiting the bad-faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from the goodwill associated with such marks—a practice commonly referred to as 'cybersquatting.'

 S. Rep. No. 106–140, at 4 (1999).

the decision to register the domain names. However, two weeks after this decision was made, Mr. Morrisseau was discharged at which time he had still taken no steps to register the subject domain names on behalf of Standing Stone. On February 16, 2000, one week after his employment was terminated, Mr. Morrisseau registered the domain names in his own name. On June 1 and June 2, 2000, plaintiff's counsel sent correspondence to Mr. Morrisseau via e-mail and regular mail advising him of his claimed violation of the ACPA as well as Standing Stone's intent to proceed with litigation in connection with said violation. In response to these "cease and desist" communications, plaintiff's counsel received an e-mail, purportedly from Mr. Morrisseau, in which Mr. Morrisseau forwarded a copy of an e-mail he had sent to another attorney who had contacted him on behalf of Standing Stone. The e-mail which plaintiff's counsel received was dated June 19, 2000. It was sent to attorney Peter Carmen at *CARMEP@MACK-LAW.COM* from *maggie@xcelco.on.ca* (Terese Bressette) with a subject line which read "Standing Stone Media, Inc. d/b/a *Indian Country Today.*" Morrisseau's purported e-mail stated that the prior e-mail to "the first law firm threatening legal action ... sum[med] up [his] position on the matter." Further, the e-mail stated:

As the second law firm to send me a threatening letter, I would expect that you could at least try to make a case for your client. As it is I know and you know they have no legal leg to stand on. If any other unwarranted threats of legal action are made that continue to be unsubstantiated, I will consider that harassment by both your firm and Standing Stone Media.

The e-mail was "signed" as follows:

Sincerely,

Miles Morrisseau

Indiancountrytoday.com

The forwarded e-mail sent to Standing Stone's previous attorney appeared as follows:

From: Terese Bressette <*maggie@xcelco.on.ca*>

To: facerstamoul@earthlink <facerstamoul@earthlink>

Date: March 24, 2000 10:09 AM

Subject: Domain name Ownership

Ms. Maria Stamoulas,

Facer and Stamoulas, P.C.

1155 Connecticut Ave. N.W.

Suite 300

Washington, D.C.

20036

Ms. Stamoulas:

In regards to you [sic] letter dated March 16, 2000.

As an employee of Standing Stone Media, it was not my responsibility and I did not have the authority to register the name Indiancountrytoday.com, [sic] in fact, when the Oneida Indian Nation DBA Standing Stone Media registered their current name Indiancountry.com they should have registered all names deemed important to the company.

The law does not exist to protect business [sic] from their own poor management. As a further example; as of this date (March 24, 2000), Standinstonemedia.net [sic] and standingstonemedia.org are available to be registered. Standingstonemedia.com is registered but by a business other than one owned by the Oneida Indian Nation. I could register both those names now, but Standing Stone is more specific to the Oneida Nation and I am not interested in it. "Indian Country" on the other hand, is a "public domain" and I was pleased to add it to the other names I have regis-

tered. I am preparing to launch my own business. It quickly became apparent that many domain names with Indian, Native and Aboriginal have been taken. All versions of Indian Country.com [sic], .net, and .org were taken, with only the first being owned by Standing Stone. I searched Indiancountrytoday and found all three were available. I bought these names for my own business interests and I have no intention of selling them.

Sincerely,

Miles Morrisseau

Standing Stone filed the present complaint on June 6, 2000. Prior to commencing suit, plaintiff's counsel conducted an investigation to determine whether Standing Stone could obtain *in personam* jurisdiction over Mr. Morrisseau. As a result thereof, plaintiff's counsel learned that Mr. Morrisseau resides or claims to reside in Ontario, Canada. Mr. Morrisseau's known e-mail address—*maggie@xcelco.on.ca*—as listed with Register.com, Inc., a registrar of internet domain names which Morrisseau used to register the domain names at issue herein, is also Canadian. Based thereupon, Standing Stone commenced this *in rem* action pursuant to the ACPA.[2] On June 16, 2000, Standing Stone deposited a "Registrar Certificate" completed by Register.com, Inc., which the registrar was required to provide pursuant to 15 U.S.C. § 1125(d)(2)(D)(i)(I).[3] Standing Stone also filed an affidavit of service reflecting compliance with the notice requirements of 15 U.S.C. § 1125(d)(2)(B).[4]

In February 2001, plaintiff's counsel sent Mr. Morrisseau another e-mail at the above-referenced address advising him that the lawsuit referenced in its prior correspondence had been commenced and that the firm was "now moving for summary judgment directing register.com to

---

**2.** Supporters of the ACPA were particularly concerned about anonymous trademark violators on the internet. Indeed, Congress was disturbed by the increasing number of individuals who registered domain names in violation of trademark rights and then eluded trademark enforcement because either they could not be found or the trademark owner was unable to acquire *in personam* jurisdiction over them. *See* S.Rep. No. 106–140, at 4 (1999); *Lucent Techs., Inc. v. Lucentsucks.com,* 95 F.Supp.2d 528, 530 (E.D.Va. 2000). Accordingly, in enacting the ACPA, Congress included an *in rem* provision to allow remedies for violations of the statute by anonymous or "absent cybersquatters." *See* S.Rep. No. 106–140, at 4. Consequently, the ACPA specifically allows a trademark owner to file an action against the domain name itself when the trademark owner cannot locate the domain name owner or cannot obtain *in personam* jurisdiction over him. *See* 15 U.S.C. § 1125(d)(2).

**3.** That section provides:

(D)(i) The remedies in an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name to the owner of the mark. Upon receipt of written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph, the domain name registrar, domain name registry or other domain name authority shall

(I) expeditiously deposit with the court documents sufficient to establish the court's control and authority regarding the disposition of the registration and use of the domain name to the court; and

(II) not transfer, suspend, or otherwise modify the domain name during the pendency of the action, except upon order of the court.

15 U.S.C. § 1125(d)(2)(D)(i)(I)-(II)

**4.** Said section incorporates the requirements of the previous subparagraph which provides that a litigant must send "notice of the alleged violation and intent to proceed under this paragraph to the registrant of the domain name at the postal and e-mail address provided by the registrant to the registrar" and "publish[ ] notice of the action as the court may direct promptly after filing the action." 15 U.S.C. §§ 1125(d)(2)(A)(ii), (B).

transfer the Domain Names to Standing Stone Media." On February 28, 2001, plaintiff's counsel received another e-mail "signed" by Mr. Morrisseau from the same address stating that the subject domain names were no longer "in [his] ownership." Indeed, the e-mail stated that the domain names had not been renewed, but "return[ed] to the open market where they can be legally registered by anyone." In light of this occurrence, the e-mail questioned the "necessity and even the legality" of plaintiff's ACPA action. Attached to the e-mail was various e-mail correspondence to Mr. Morrisseau from Register.com, Inc. advising him of his failure to renew the subject domain names and his registrations' consequent expiration on February 16, 2001.[5]

## III. DISCUSSION

### A. *ACPA*

■ The ACPA was, in part, a reflection of Congress' view that the legal remedies available for victims of cybersquatting were "expensive and uncertain." *See* H.R.Rep. No. 106–412, at 6 (1999). Specifically, Congress found that cyberpiracy could be damaging to businesses in a number of ways: by expropriating a mark as part of a domain name, a "cyberpirate" could prevent the trademark owner from using that mark as part of its domain name, thereby diverting business opportunities elsewhere. *See id.* Moreover, a cyberpirate's use of a mark as part of its domain name could blur the distinctive quality of the mark or in some instances tarnish the mark. *See id.* A cyberpirate's use of a mark makes it extremely difficult for trademark owners to police and enforce their trademark rights by preventing

unauthorized use, which they are required to do or risk losing those rights entirely. *See id.* Thus, the ACPA was designed "[t]o remedy the perceived shortcomings of applying the [Federal Trademark Dilution Act, 15 U.S.C. §§ 1125, 1127] in cybersquatting cases[.]" *Sporty's Farm, L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 496 (2d Cir.2000), *cert. denied,* 530 U.S. 1262, 120 S.Ct. 2719, 147 L.Ed.2d 984 (2000).

The ACPA is comprised of two avenues for pursuing defendants in trademark actions. The first, 15 U.S.C. § 1125(d)(1), provides for an *in personam* civil action against violators of the Act. The second, 15 U.S.C. § 1125(d)(2), creates the option of proceeding in rem against the domain names themselves to counter the unlawful activity of foreign-resident cybersquatters. *See Heathmount A.E. Corp. v. Technodome.com.*, 106 F.Supp.2d 860, 867 (E.D.Va.2000) (discussing legislative history of *in rem* provision of ACPA).

### B. *Availability of In Rem Jurisdiction*

The ACPA provides:

(A) The owner of a mark may file an *in rem* civil action against a domain name *in the judicial district* in which the domain registrar, domain registry, or other domain name authority that registered or assigned the domain names is located if

(i) the domain name violates an right of the owner of a mark registered in the Patent and Trademark Office, or protected under subsection (a) or (c); and

(ii) the court finds that the owner—

(I) is not able to obtain in personam jurisdiction over a person who would

---

**5.** In view of Mr. Morrisseau's registration of the domain names having lapsed, counsel for plaintiff advised the Court that they were investigating the possibility of Standing Stone simply registering the domain names itself upon discontinuance of the present action. To date, the Court has received no additional correspondence from plaintiff's counsel concerning whether this alternative resolution strategy was a viable option.

have been a defendant in a civil action under paragraph (1); or

(II) through due diligence was not able to find a person who would have been a defendant in a civil action under paragraph (1) . . . .

15 U.S.C. § 1125(d)(2)(A) (emphasis added). Paragraph 2 further provides in subsection (C):

In an *in rem* action *under this paragraph* a domain name shall be deemed to have its situs in the judicial district in which

(i) the domain name registrar, registry or other domain name authority that registered or assigned the domain name is located; or

(ii) documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court.

15 U.S.C. § 1125(d)(2)(C) (emphasis added).

Because he resides in Canada, has no known contacts with New York and committed the acts at issue herein from his computer in Canada, it seems clear based on plaintiff's submissions that Standing Stone would be unable to obtain *in personam jurisdiction* over Miles Morrisseau, in New York or, for that matter, in any other jurisdiction in the United States. Thus, the inquiry turns to whether plaintiff has properly established a basis for this Court's assertion of *in rem* jurisdiction over the domain names themselves.

Upon observing that the domain name registrar in question herein—Register.com, Inc.—is located in New York City which is in the Southern District of New York, the Court ordered plaintiff to file an additional brief addressing the availability of *in rem* jurisdiction in the Northern District of New York. Plaintiff concedes that while it has not filed this action in the judicial district in which Register.com, Inc. is located, it has complied with subsection (2)(D)(i) of the ACPA by having Register.com, Inc. deposit the certificates of registration for the three domain names in question with the Clerk of the Court for the Northern District. See 15 U.S.C. § 1125(d)(2)(D)(i). Consequently, plaintiff asserts it is entitled to assert *in rem* jurisdiction over the domain names in the Northern District of New York under the alternative jurisdictional basis provided in subsection (d)(2)(C).[6] This Court disagrees.

Given the tender age of the ACPA, there is scant case law examining the statute's jurisdictional implications. However, all courts which have examined the question of whether 15 U.S.C. § 1125(d)(2)(C) was intended as an alternative for asserting *in rem* jurisdiction over domain names have rejected the suggestion. In *Mattel, Inc. v. Barbie–Club.Com*, 2001 WL 436207 (S.D.N.Y. May 1, 2001), the court held as had the District of Massachusetts in *FleetBoston Fin. Corp. v. FleetBostonFinancial.com*, 138 F.Supp.2d 121 (D.Mass.2001), that the "[Anticybersquatting Consumer Protection Act ('ACPA') ] does not provide for *in rem* jurisdiction *except in the judicial district* in which the domain registry, registrar, or other domain authority is located." *Mattel, Inc.*, 2001 WL 436207, at *2 (quoting *FleetBoston*, 138 F.Supp.2d at 135) (emphasis added). Indeed, these courts held that § 1125(d)(2)(C) "exists to facilitate the continuation of litigation in

---

**6.** As referenced above, this subsection provides that in an *in rem* action under Paragraph (2), a domain name shall have its situs in either the judicial district where the domain name registrar is located or in the district where the requisite documents and certificates of registration have been deposited as required by subsection (2)(D)(i).

one of the districts identified in subparagraph (2)(A)." *Id.*

In both cases, the courts were faced with domain registrars located in a different state than the chosen forum. Thus, the courts found that depositing the documents referred to in § 1125(d)(2)(C) in a judicial district where the domain registrar is *not* located was insufficient to confer *in rem* jurisdiction over the subject domain names. Otherwise ACPA litigants would be free to commence actions in a jurisdiction of their choosing despite the absence of any connection to the *res.* The present case is distinguishable from those cited above in the sense that New York has four judicial districts and thus plaintiff herein chose the correct state in which to sue. However, the *in rem* provision of the ACPA does not provide that an action may be commenced in either the "state" or "jurisdiction" where the registrar is located. Rather, the statute explicitly states that an in rem action is limited to the judicial district in which the domain name registrar is located. A contrary reading of the statute would result in enjoyment by ACPA litigants in New York of a benefit unavailable to litigants in states having only one judicial district.

In *Cable News Network, L.P., L.L.L.P., v. CNNews.com,* 162 F.Supp.2d 484, 489 n. 15 (E.D.Va.2001), the court noted in regard to subsection (d)(2)(C) of the ACPA:

> This section does not confer *in rem* jurisdiction; instead, by its terms, it merely provides that a domain name has a "situs" where the domain name registrar, registry, or other domain name authority is located and where "documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name are deposited with the court." 15 U.S.C. § 1125(d)(2)(C). Moreover, were both Section 1125(d)(2)(A) and Section 1125(d)(2)(C) to be read as providing *in*

*rem* jurisdiction, all of Section 1125(d)(2)(A) and portions of Section 1125(d)(2)(C) would be rendered redundant, an impermissible result. *See FleetBoston,* 138 F.Supp.2d at 124–26 (discussing the redundancy problems that would follow if Section 1125(d)(2)(C) were read as to confer *in rem* jurisdiction). Courts generally avoid interpreting statutes in such a way as to make any part redundant. *See United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955).

More recently, the court in *Ford Motor Co. v. Greatdomains.Com, Inc.,* 177 F.Supp.2d 656, 658 (E.D.Mich.2001), while not reaching the issue of whether subsection (d)(2)(C) provides an additional means to attain *in rem* jurisdiction, clearly suggested it would reject the argument if required to consider it.

Plaintiff argues that the decisions by the courts in *Mattel, Inc.* and *FleetBoston* rendered subsection (d)(2)(C) of the ACPA either superfluous or meaningless, either of which is an impermissible result. This Court disagrees. Although arguably a poorly drafted statute with provisions which may be deemed ambiguous, the Court finds nothing superfluous or meaningless in failing to view subsection (d)(2)(C) of the ACPA as an alternative basis for *in rem* jurisdiction. As the court noted in *FleetBoston:*

> The statute simply does not make linguistic sense if it is read to allow actions to be brought either in the judicial district in which the registrar, registry, or other authority is located or in any judicial district that the plaintiff chooses to bring the action. Subparagraph (C) states that it pertains to "an *in rem* action brought under this paragraph," signifying that it pertains to the same action specified in subparagraph (A). Furthermore, nothing in subparagraph

(C) or (D) suggests that it provides for an *in rem* action other than the one brought under subparagraph (A), which specifies that the action may only be brought in the judicial district in which the registrar, registry, or other authority is located.

The procedure described in subparagraph (D) provides the mechanism by which the domain name can be deposited in the court in the judicial district designated under subparagraph (A). It also relates to "in an *in rem* action under this paragraph," and continues by specifying that the procedure is commenced when a plaintiff sends the domain name registrar, registry or other authority "written notification of a filed, stamped copy of a complaint filed by the owner of a mark in a United States district court under this paragraph. . . ." (D)(i). Thus, the situs of the domain name can only be transferred after a complaint has been filed; the complaint can only be filed in the judicial district in which the registry, registrar, or other authority is located. *See* § (d)(2)(A). Consequently, the situs of the domain name will likewise have to end up in one of those places, despite the language of (2)(C)(ii) which seems to suggest that it could be transferred elsewhere.

138 F.Supp.2d at 125–26. In addition to dictating the situs of the domain name during the pendency of an action under the ACPA, subsection (d)(2)(C) may also be read as a savings provision in the event that the registrar of a domain name moves out of the judicial district where the action was commenced, goes out of business or sells its interests to another company in the time period between the filing of the complaint and the deposit of the required certificates of registration.

Plaintiff cites *Caesars World, Inc. v. Caesars–Palace.Com*, 112 F.Supp.2d 502, 505 (E.D.Va.2000) for the proposition that subsection (d)(2)(C) is a standard venue provision which can be waived based on both Morrisseau and Register.com having failed to object to venue here. Moreover, plaintiff asserts that Morrisseau had "significant connections" with the Northern District of New York during his employment with plaintiff in Canastota, New York. To wit, plaintiff argues that Morrisseau worked in this District, failed to register the domain names in the course of his employment and then fled the jurisdiction to Canada. Even assuming that subsection (d)(2)(C) is a venue provision, plaintiff's argument fails on multiple levels. In the first instance, *Caesars World, Inc.* is inapposite since the plaintiff in that case commenced suit in the judicial district where the domain name registrar was located. Thus, *in rem* jurisdiction in that case was based on subsection (d)(2)(A).

Moreover, the "significant connections" which plaintiff asserts exist between Miles Morrisseau and the Northern District of New York are (a) inconsistent with its claim that it cannot satisfy the "minimum contacts" requirement of New York's long-arm statute to sue Morrisseau in New York; and (b) irrelevant. *See Cable News Network*, 162 F.Supp.2d at 491 (when an action is properly categorized as " 'true *in rem*,' there is no requirement that the owner or claimant of the *res* have minimum contacts with the forum. More particularly, in an ACPA *in rem* action, it is not necessary that the allegedly infringing registrant have minimum contacts with the forum; it is enough . . . that the [domain name] registry is located in the forum"). As a further matter, Morrisseau is not being sued in the Northern District for failing to comply with the terms of his employment contract with plaintiff, but rather, for actions he took once he was residing in Canada. The only legally relevant connection between Morrisseau and the present litigation is his having registered the defendant domain names for

himself by contacting Register.com which is located in the Southern District of New York. Based on the plain meaning of the statute and its unanimous interpretation by federal courts, plaintiff cannot maintain the present ACPA action in this District.

### C. *Transfer of the Action*

 Plaintiff requests that in the event the Court determines that in rem jurisdiction is lacking in the Northern District of New York, it exercise its discretion in transferring the case to the Southern District where Register.com, Inc. is located. The federal statute governing cure or waiver of procedural defects provides: "The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. S 1406(a). A court has considerable discretion in deciding whether to dismiss or transfer. *See Minnette v. Time Warner*, 997 F.2d 1023, 1027 (2d Cir.1993); *Gatto v. Pier 44, Inc.*, 1998 WL 151874, *1 (N.D.N.Y. March 26, 1998). Section 1406(a) has been interpreted to authorize a transfer even where the transferor court does not have personal jurisdiction over the party contesting jurisdiction. *See Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); *Corke v. Sameiet M.S. Song of Norway*, 572 F.2d 77, 80 (2d Cir.1978) (citing *Volk Corp. v. Art–Pak Clip Art Serv.*, 432 F.Supp. 1179, 1181 (S.D.N.Y.1977)). Rather, a court is only required to have subject matter jurisdiction over the matter. *See Gatto*, 1998 WL 151874, at *1 (citing *McCulley v. Anglers Cove Condominium Assoc., Inc.*, 977 F.Supp. 177, 180–81 (E.D.N.Y.1997) (citing *Goldlawr*, 369 U.S. at 466, 82 S.Ct. 913) ("The language of § 1406(a) is amply broad to authorize the transfer of cases, however wrong the plaintiff may have been in filing his case as to

venue, whether the court in which it was filed had personal jurisdiction over the defendants or not.")).

In the present case, subject matter jurisdiction is satisfied because plaintiff sues under a federal statute. Based thereupon, the Court deems transfer of this action is warranted "in the interest of justice." 28 U.S.C. § 1406(a).

### IV. CONCLUSION

Based upon the foregoing it is hereby

ORDERED that plaintiff's motion to transfer this matter to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1406 is GRANTED.

IT IS SO ORDERED.