PORSCHE CARS NORTH AMERICA, INCORPORATED; Dr. Ing. H.C.F. Porsche AG, Plaintiffs–Appellants,

v.

PORSCHE.NET; Porscheclub.Net; Porscheloans.Com; Porschelease.Com; Porscheloan.Com, Defendants–Appellees,

and

Porsch.Com, an internet domain name and the following internet domain names: Porschecar.Com; Porschagirls.Com; 928 Porsche.Com; Accessories4porsche.Com; Allporsche.Com; Beverlyhillsporsche.Com; Boxster.Com; Boxster.Net; Boxsters.Com; Buyaporsche.Com; Calporsche.Com; E–Porsche.Com; Everythingporsche.Com; Formulaporsche.Com; Iansporsche.Com; Idoporsche.Com; Laporsche.Com; Lynchporsche.Com; Myporsche.Com; Newporsche.Com; Parts4porsche.Com; Po[Zero]Rsche.Com; Passion–Porsche.Com; Porsche.Org; Porsche–911.Com; Porsche–911.Net; Porsche–944.Com; Porsche–Accessories.Com; Porsche–Autos.Com; Porsche–Books.Com; Porsche–Carrera.Com; Porsche–Cars. Com; Porsche–City.Com; Porsche–Classic.Com; Porsche–Exchange.Com; Porsche–Leasing.Com; Porsche–Lynn.Com; Porsche–Modellclub.Com; Porsche–Munich.Com; Porsche–Net.Com; Porsche–Nl.Com; Porsche–Online.Com; Porsche–Rs. Com; Porsche–Sales.Com; Porsche–Service.Com; Porsche–Supercup.Com; Porsche–Web.Com; Porsche356.Com; Porsche4me.Com; Porsche4sale.Com; Porsche911.Com; Porsche911.Net; Porsche911.Org; Porsche911parts.Com; Porsche914.-Com; Porsche924.Com; Porsche944.-Com; Porsche993.Com; Porsche996.-Com; Porscheag.Com; Porscheaudiparts.Com; Porschebooks.Com; Porscheboxter.Com; Porschecarrera.Com; Porschecars.Com; Porschecarsales.Com; Porschecarsforsale.Com; Porschecasino.Com; Porschechat.Com; Porscheclassified.Com; Porscheclub.Org; Porscheconnection.Com; Porschedealer.Com; Porschedealer.Net; Porschedealers.Com; Porschedealers.Net; Porschedirect.Com; P[Orschedirect.Net]; Porschedoctor.Com; Porschefans.Com; Porschefleet.Com; Porscheformula.Com; Porschefx.Com; Porschegt.Com; Porschehaus.Com; Porschelynn.Com; Porschemail.Com; Porschenow.Com; Porschenut.Com; Porscheonline.Com; Porscheowner.Com; Porscheowners.Com; Porscheownersclub.Com; Porscheparts.Com; Porscheparts.Net; Porschephiles.Org; Porscheproducts.Com; Porscheracing.Com; Porscherims.Com; Porsches.Com; Porschesales.Com; Porschesalestoday.Com; Porschescape.Com; Porscheservice.Com; Porschesplayhouse.Com; Porschestore.Net; Porschestore.Com; Porschestuff.Com;

Porschesucks.Com; Porschetoday.Com; Porschetrader.Com; Porscheweb.Com; Porscheworld.Com; Porschezentrum.Com; Porschezentrum.Net; Porsche.Com; Pristineporsche.Com; Porsche.Com; Ultimateporsche.Com; Usedporsche.Com; Usedporsches.Com; Winaporsche.Com, Defendants.

Porsche Cars North America, Incorporated; Dr. Ing. H.C.F. Porsche AG, Plaintiffs–Appellees,

v.

Porsche.Net; Porscheclub.Net, Defendants–Appellants,

and

Porsch.Com, an internet domain name and the following internet domain names: Porschecar.Com; Porschagirls.Com; 928Porsche.Com; Accessories4porsche.Com; Allporsche.Com; Beverlyhillsporsche.Com; Boxster.Com; Boxster.Net; Boxters.Com; Buyaporsche.Com; Calporsche.Com; E–Porsche.Com; Everythingporsche.Com; Formulaporsche.Com; Ianporsche.Com; Idoporsche.Com; Laporsche.Com; Lynchporsche.Com; Myporsche.Com; Newporsche.Com; Parts4porsche.Com; Po[Zero]Rsche.Com; Passion–Porsche.Com; Porsche.Org; Porsche–911.Com; Porsche–911.Net; Porsche–944.Com; Porsche–Accessories.Com; Porsche– Autos.Com; Porsche–Books.Com; Porsche–Carrera.Com; Porsche–Cars. Com; Porsche–City.Com; Porsche– Classic.Com; Porsche–Exchange.Com; Porsche–Leasing.Com; Porsche–Lynn.Com; Porsche–Modellclub.Com; Porsche–Munich.Com; Porsche–Net.Com; Porsche–Nl.Com; Porsche–Online.Com; Porsche–Rs. Com; Porsche–Sales.Com; Porsche– Service.Com; Porsche–Supercup.Com; Porsche–Web.Com; Porsche356.Com; Porsche4me.Com; Porsche4sale.Com; Porsche911.Com; Porsche911.Net; Porsche911.Org; Porsche911parts.Com; Porsche914.Com; Porsche924.Com; Porsche944.Com; Porsche993.Com; Porsche996.Com; Porscheag.Com; Porscheaudiparts.Com; Porschebooks.Com; Porscheboxter.Com; Porschecarrera.Com; Porschecars.Com; Porschecarsales.Com; Porschecarsforsale.Com; Porschecasino.Com; Porschechat.Com; Porscheclassified.Com; Porscheclub.Org; Porcheconnection.Com; Porschedealer.Com; Porschedealer.Net; Porschedealers.Com; Porschedealers.Net; Porschedirect.Com; Porschedirect.Net; Porschedoctor.Com; Porschefans.Com; Porschefleet.Com; Porscheformula.Com; Porschefx.Com; Porschegt.Com; Porschehaus.Com; Porschelease.Com; Porscheloan.Com; Porscheloans.Com; Porschelynn.Com; Porschemail.Com; Porschenow.Com; Porschenut.Com; Porscheonline.Com; Porscheowner.Com; Porscheowners.Com; Porscheownersclub.Com; Porscheparts.Com; Porscheparts.Net; Porschephiles.Org; Porscheproducts.Com; Porscheracing.Com; Porscherims.Com; Porsches.Com; Porschesales.Com; Porschesalestoday.Com; Porschescape.Com; Porscheservice.Com; Porschesplayhouse.Com; Porschestore.Com; Porschestore.Net; Porschestuff.Com; Porschesucks.Com; Porschetoday.Com; Porschetrader.Com; Porscheweb.Com; Porscheworld.Com; Porschezentrum.Com; Porschezentrum.Net; Porsche.Com; Pristineporsche.Com; Porsche.Com; Ultimateporsche.Com; Usedporsche.Com; Porschestore.Com; Usedporches.Com; Winaporsche.Com, Defendants.

Nos. 01–2028, 01–2073.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 2002.

Decided Aug. 23, 2002.

**ARGUED:** Thomas Rex Lee, Howard, Phillips & Andersen, P.C., Salt Lake City, Utah, for Plaintiffs–Appellants. Darren James Quinn, Law Offices of Darren J. Quinn, San Diego, California, for Defendants–Appellees. **ON BRIEF:** Gregory D. Phillips, Howard, Phillips & Andersen, P.C., Salt Lake City, Utah; John F. Anderson, Richards, McGettigan, Reilly & West, Alexandria, Virginia, for Plaintiffs–Appellants. Paul M. DeCicco, Law Offices of Paul Michael Decicco, San Diego, California, for Defendants–Appellees.

Before WILKINSON, Chief Judge, MOTZ, Circuit Judge, and BOBBY R. BALDOCK, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

Affirmed in part, dismissed in part, and vacated and remanded in part by published opinion. Judge MOTZ wrote the opinion, in which Chief Judge WILKINSON and Senior Judge BALDOCK joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge.

Porsche Cars North America, Incorporated and Dr. Ing. h.c.F. Porsche AG, a German company, brought this in rem action against certain Internet domain names related to the name "Porsche" or another Porsche trademark, seeking an injunction that would transfer the right to use the domain names. The Porsche companies contend that some of the domain names violated their rights under the Anticybersquatting Consumer Protection Act, 15 U.S.C.A. § 1125(d)(1) (West Supp.2002), and that all of the domain names diluted their trademark in contravention of 15 U.S.C.A. § 1125(c) (West 1998 & Supp.

2002). The district court dismissed both claims. Because the district court rejected the anticybersquatting claims against some domain names on the basis of a challenge to in rem jurisdiction raised only three days before trial without excuse for the delay, we vacate the order dismissing those claims. However, because federal trademark-dilution law does not authorize the remedy Porsche seeks under 28 U.S.C.A. § 1655 (West 1994), we affirm the order dismissing the trademark-dilution claims.

## I.

The Internet is an "international computer network of both Federal and non-Federal interoperable packet switched data networks": a network of computers all around the world through which people communicate information to each other. 47 U.S.C.A. § 230(f)(1) (West 2001); *see also* 15 U.S.C.A. § 1127 (West Supp.2002) (incorporating this definition for trademark law); 47 U.S.C.A. § 231(e)(3) (West 2001) (providing an alternative definition for a different statutory provision).

Federal law defines a domain name as "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C.A. § 1127. Also known colloquially as a "Web address," a domain name is a combination of characters that a person types into a computer software program called a browser, in order to gain access to a Web site, a set of computer files through which another person provides information over the Internet. *See Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 492–93 (2d Cir.2000).

A person seeking the right to use a particular domain name may register with one of a number of registrar organizations that assign domain names on a first-come first-served basis. *See id.* at 493. Many consumers look for a given company's Web site by checking to see if the company uses a domain name made up of the company's name or brand name with the suffix ".com." A person might, for example, look for information about Baltimore's major-league baseball team by typing "www.baltimoreorioles.com". For this reason, "companies strongly prefer that their domain name be comprised of the company or brand trademark and the suffix.com." *Id.; see also Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1044–45 (9th Cir.1999).

On January 6, 1999, the two Porsche companies (collectively "Porsche") filed a trademark-dilution action under 15 U.S.C.A. § 1125(c) against 128 domain names related to Porsche trademarks. Porsche alleged that consumers' discovery on the Internet of domain names including Porsche's trademarks or their variants diluted its marks in violation of § 1125(c). In its complaint, Porsche sought only one form of relief—"[t]hat the Domain Names be preliminarily and permanently transferred ... to Porsche"—and asserted a single basis for in rem jurisdiction—28 U.S.C.A. § 1655.

Few of the domain names offered any defense. The district court entered default judgments against many of them, and Porsche voluntarily dismissed its claims against many others. Five domain names did remain in the action. Christian Holmgreen, a British citizen, had registered two of them: porsche.net and porscheclub.net (collectively "the British domain names"). Alan J. Martin, a resident of the state of Georgia who did business under a trade name, had registered three others: porschelease.com, porscheloan.com, and por-

scheloans.com (collectively "the Georgia domain names").

On motion by the British domain names, the district court dismissed the complaint in its entirety on the ground that 28 U.S.C.A. § 1655 provided no in rem jurisdiction for the asserted trademark-dilution claims. *See Porsche Cars N. Am., Inc. v. Porsch.Com*, 51 F.Supp.2d 707 (E.D.Va. 1999), *vacated by Porsche Cars N. Am., Inc. v. Allporsche.com*, Nos. 99–1804 & 99–2152, 2000 WL 742185 (4th Cir. June 9, 2000).

While Porsche's appeal from the dismissal order was pending in this court, Congress enacted the Anticybersquatting Consumer Protection Act (ACPA or "the anticybersquatting statute"), authorizing in rem actions against domain names in certain circumstances. Pub.L. No. 106–113, 113 Stat. 1501, 1501A–545 (1999), *codified in relevant part at* 15 U.S.C.A. § 1125(d). We therefore vacated the district court's order dismissing the case and remanded for consideration of the ACPA, without reaching the question of whether § 1655 provided a basis for in rem jurisdiction for the trademark-dilution claims asserted by Porsche. *See Porsche*, 2000 WL 742185.

On August 11, 2000, Porsche amended its complaint, adding anticybersquatting claims under 15 U.S.C.A. § 1125(d)(1) and reiterating its trademark-dilution claims. A month later, the British and Georgia domain names moved to dismiss the amended complaint. On December 29, 2000, the district court again dismissed the trademark-dilution claims for lack of jurisdiction under § 1655. The court also dismissed the anticybersquatting claims against the Georgia domain names because it found that in personam jurisdiction was available against Martin.

The in rem anticybersquatting claims against the British domain names have a more complex procedural history. On December 29, 2000, the court ruled that the amended complaint did not allege sufficient facts to demonstrate that Porsche had exercised due diligence in seeking to obtain in personam jurisdiction over Holmgreen, and so dismissed the in rem anticybersquatting claims against the British domain names. However, this dismissal was without prejudice, permitting Porsche to file a second amended complaint to plead specifically the efforts it had made to obtain personal jurisdiction over Holmgreen. Porsche then did file a second amended complaint, which the British domain names again moved to dismiss, asserting that Porsche still had not alleged facts sufficient to demonstrate a diligent search for Holmgreen's contacts with the United States.

On February 23, 2001, after oral argument, the district court denied the motion to dismiss the second amended complaint, finding that Porsche had exercised due diligence and had satisfactorily demonstrated a lack of personal jurisdiction over Holmgreen within the United States. The court explained that given "[t]he reality of [Porsche's] counsel's research efforts and the fact that all parties involved have known for almost two years that Holmgreen has no contacts with the United States," it was "satisfied that due diligence has been exerted and that personal jurisdiction is lacking through[out] the United States." The court explicitly "found that in rem jurisdiction [under the ACPA] is proper."

On July 13, 2001, three days prior to the scheduled trial date, the British domain names notified the district court that Holmgreen had decided to submit to personal jurisdiction in the United States District Court for the Southern District of California. The British domain names then moved to dismiss the in rem anticybersquatting claims against them, arguing

that the decision by Holmgreen divested the district court of in rem jurisdiction under the ACPA. *See* 15 U.S.C.A. § 1125(d)(2)(A)(ii).

Although the district court expressed frustration with Holmgreen's eleventh-hour decision to submit to personal jurisdiction in federal court in California, it ruled that this decision did divest it of in rem jurisdiction. For this reason, the district court dismissed Porsche's anticybersquatting claims against the British domain names. The court characterized its dismissal as "without prejudice," but ruled that as long as in personam jurisdiction over Holmgreen was available in federal court in California, Porsche could not proceed in rem against the domain names in this action.

Porsche appeals from the order dismissing, without prejudice, its anticybersquatting claims against the British domain names and from the order dismissing, with prejudice, its trademark-dilution claims against the British and the Georgia domain names.[1] We address first the anticybersquatting claims and then the trademark-dilution claims. We note that we have jurisdiction over the anticybersquatting claims, despite the district court's characterization of its dismissal of them as "without prejudice," because "the grounds for dismissal clearly indicate that 'no amendment [in the complaint] could cure the defects in the plaintiff's case.'" *Domi-*

*no Sugar Corp. v. Sugar Workers Local 392*, 10 F.3d 1064, 1067 (4th Cir.1993) (citation omitted; interpolation in original).

## II.

■ The anticybersquatting statute authorizes in rem jurisdiction over a domain name if personal jurisdiction over the registrant of the domain name is unavailable. In relevant part, the ACPA provides:

The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located if

(i) the domain name violates any right of the owner of a mark registered in the Patent and Trademark Office . . . ; and

(ii) the court finds that the owner—

(I) is not able to obtain in personam jurisdiction over a person who would have been a civil defendant [in a suit].

15 U.S.C.A. § 1125(d)(2)(A) (West Supp. 2002).

On February 23, 2001, the district court found that it had jurisdiction over the British domain names under the ACPA.[2] *See* 15 U.S.C.A. § 1125(d)(2)(A)(ii)(I). Months later and just three days before the sched-

---

1. The British domain names cross-appeal from the district court's orders denying their motions for attorney's fees and Rule 11 sanctions. Our resolution of the appeal moots these claims; accordingly, we dismiss the cross-appeal.

2. Our ACPA analysis involves only the claims of the British domain names, because Porsche has not appealed from the district court's order dismissing its ACPA claims against the Georgia domain names. We further note that the district court did not construe Porsche's

pleadings to state either a trademark-dilution claim under § 1125(c) that relied on § 1125(d)(2) as its jurisdictional basis or an anticybersquatting claim under § 1125(d)(1) that relied on § 1655 as its jurisdictional basis. In this court, Porsche did not challenge this construction in its briefs, *see* Brief of Appellant at 5, and expressly endorsed the construction at oral argument. *See Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214 (4th Cir.2002) (permitting a claim for trademark dilution under § 1125(c) with § 1125(d)(2) as the jurisdictional basis).

uled trial in Virginia, the British domain names notified the court that their registrant had decided to submit to personal jurisdiction in California. For that reason, the district court concluded that it had lost in rem jurisdiction under the ACPA as a matter of law.

## A.

■ The British domain names contend, as the district court agreed, that "once there is in personam jurisdiction, you can no longer proceed in rem"—no matter when the in personam jurisdiction arises.

We recognize at the outset that the structure of the ACPA undoubtedly expresses Congress's preference for in personam suits: the holder of a trademark must convince the court that in personam jurisdiction over a person is unavailable before an ACPA in rem action may proceed. See 15 U.S.C.A. § 1125(d)(2)(A); see also Alitalia–Linee Aeree Italiane S.p.A. v. Casinoalitalia.com, 128 F.Supp.2d 340, 343–47 (E.D.Va.2001); Lucent Techs., Inc. v. Lucentsucks.com, 95 F.Supp.2d 528, 534 (E.D.Va.2000). The statute simply does not require, however, that those conditions continue throughout the litigation. If it did, in rem jurisdiction could be lost even long after a court has made the requisite statutory finding permitting in rem jurisdiction under the ACPA, no matter how late in personam jurisdiction arose. To put it simply, we can find nothing, either in case law or in the ACPA itself, to support such a conclusion.

## 1.

Because none of the relatively few ACPA cases to date offer any kind of support for the British domain names' position, they rely exclusively on non-ACPA cases.

Specifically, the domain names look to non-ACPA cases that state the unremarkable proposition that subject-matter jurisdiction cannot be waived. See, e.g., Lovern v. Edwards, 190 F.3d 648, 654 (4th Cir. 1999); see also 13 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3522 (2d ed. 1984 & Supp.2002). Initially, it is far from clear that this well-known aspect of subject-matter jurisdiction has anything to do with in rem jurisdiction. Porsche's assertion of substantive claims under federal statutes, the ACPA and the trademark-dilution statute, invokes a federal court's subject-matter jurisdiction, see 28 U.S.C.A. § 1331 (West 1993), while in rem jurisdiction concerns a court's authority over the res—in this case, the domain names Porsche seeks. See Dluhos v. Floating and Abandoned Vessel, Known as "New York", 162 F.3d 63, 73 (2d Cir. 1998) (referring to admiralty law and the diversity statute as alternate "bas[es] of subject matter jurisdiction" for a plaintiff seeking to pursue an action in rem); Standing Stone Media, Inc. v. Indiancountrytoday. com, 193 F.Supp.2d 528, 536 (N.D.N.Y.2002) (treating subject-matter jurisdiction as distinct from in rem jurisdiction, in an ACPA in rem case).

■ Even if we accepted that the parties' inability to waive subject-matter jurisdiction should inform our analysis of in rem jurisdiction, we can find no support for the separate proposition that the conditions that create subject-matter jurisdiction must necessarily persist throughout the life of a case. For example, it is black-letter law that the conditions that create diversity jurisdiction, one well-known basis for subject-matter jurisdiction, need not survive through the life of the litigation. Rather, a court determines the existence of diversity jurisdiction "at the time the action is filed," regardless of later changes

in originally crucial facts such as the parties' citizenship or the amount in controversy. *Freeport–McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428, 111 S.Ct. 858, 112 L.Ed.2d 951 (1991); *see also generally* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 3608 (2d ed. 1984 & Supp.2002).

■ Similarly, although federal courts lack subject-matter jurisdiction over a case involving only state-law claims in the absence of diversity jurisdiction, a court may retain supplemental jurisdiction over purely state-law claims after resolving a claim that initially gave it subject-matter jurisdiction over the case. *See* 28 U.S.C.A. § 1367(c)(3) ("The district court[ ] *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." (emphasis added)); *Rosado v. Wyman*, 397 U.S. 397, 402–05, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 3567.1.

■ In any event, personal jurisdiction, rather than subject-matter jurisdiction, seems far more analogous to in rem jurisdiction. *See United States v. 51 Pieces of Real Property*, 17 F.3d 1306, 1309 (10th Cir.1994) (discussing in rem jurisdiction as a form of "jurisdiction . . . over . . . the parties"); *United States v. Republic Marine, Inc.*, 829 F.2d 1399, 1401 n. 1 (7th Cir.1987) (discussing in rem jurisdiction as a "form[ ] of jurisdiction over the party"); *FleetBoston Fin. Corp. v. FleetBostonFinancial.com*, 138 F.Supp.2d 121, 129 (D.Mass.2001) (discussing them as forms of "territorial jurisdiction"); 5A Charles Alan Wright & Arthur R. Miller § 1351 (2d ed.1990) (discussing the relationship between in rem and in personam jurisdiction). The law of personal jurisdiction, however, offers even less support to the British domain names, because personal jurisdiction is indubitably waived absent timely objection. *See* Fed.R.Civ.P. 12(b)(2), 12(h) (2002); *Rector v. Approved Fed. Sav. Banks*, 265 F.3d 248, 253 n. 2 (4th Cir.2001); 5A Wright & Miller § 1351 (citing cases). If a party *may* waive its objections to a form of jurisdiction, it follows that the conditions that create that jurisdiction cannot be necessary in every case to a court's power to hear the case, or required to exist throughout the life of the case.

Furthermore, in case law considering objections to in rem jurisdiction other than the one presented in our case, we have found no support for the British domain names' contention. Rather, in admiralty and civil forfeiture cases, for years courts have held that objections to in rem jurisdiction may be waived. *Republic Marine*, 829 F.2d at 1401 n. 1 ("[J]urisdiction in rem, like other forms of jurisdiction over the party, may be waived . . . .") (admiralty); *Cavcar Co. v. M/V Suzdal*, 723 F.2d 1096, 1102 n. 14 (3d Cir.1983) (admiralty); *Fish v. Bamby Bakers, Inc.*, 76 F.R.D. 511, 513 (N.D.N.Y.1977) (civil forfeiture); *see also Farwest Steel Corp. v. Barge Sea–Span 241*, 769 F.2d 620, 621–23 (9th Cir. 1985) (finding consent to in rem admiralty jurisdiction). We recently reached a similar conclusion in an ACPA case. *See Harrods*, 302 F.3d at 225 n. 7. Because some objections to the existence of in rem jurisdiction itself may be waived, plainly not all of the conditions that create in rem jurisdiction must persist throughout the life of the case.

Considering another non-ACPA condition of in rem jurisdiction in the forfeiture context, moreover, the Supreme Court has rejected an argument similar to that of the British domain names. Although at the beginning of a civil forfeiture case the res must be located in the jurisdiction that asserts authority over it, the Court has

held that a federal court's appellate jurisdiction over the in rem case survives even if the res is removed from the jurisdiction. *See Republic Nat'l Bank of Miami v. United States,* 506 U.S. 80, 93, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992); *see also Stevedoring Servs. of Am. v. Ancora Transport N.V.,* 59 F.3d 879, 881–83 (9th Cir. 1995) (extending *Republic National Bank* to the admiralty context).

True, the *Republic National Bank* Court was considering a challenge to in rem jurisdiction by the party that had initiated the action, distinguishing our case in part—but the Court also emphasized that the party challenging jurisdiction had itself chosen to move the res, *see id.* at 82–83, 88–89, 113 S.Ct. 554, just as, in our case, both the factual change (submission to personal jurisdiction) and the jurisdictional challenge have the same origin. Furthermore, the Supreme Court's general reflections on the nature of jurisdiction and the conditions that create it militate strongly against that argument. "Stasis is not a general pre-requisite to the maintenance of jurisdiction," the Court explained, noting both that a party can waive personal jurisdiction and that a party cannot defeat diversity jurisdiction by pointing to later factual changes. *Id.* at 88, 113 S.Ct. 554. Moreover, the Court concluded, "[n]othing in the nature of *in rem* jurisdiction suggests a reason to treat it differently." *Id.*

In sum, the case law appears to be void of support for the British domain names' position, and the Supreme Court's statements in *Republic National Bank* seriously undermine their theory as a general proposition.

#### 2.

Nor does the anticybersquatting statute suggest any reason to treat ACPA in rem jurisdiction differently. The statute permits "the owner of a mark" to "file" an in rem action against a domain name if "the court finds that the owner ... is not able to obtain in personam jurisdiction over a person who would have been a civil defendant" in an action concerning that domain name. 15 U.S.C.A. § 1125(d)(2)(A)(ii)(I). It thus calls for a finding early in the case as to whether in rem jurisdiction exists, implying that a court should address any objections to in rem jurisdiction before making that finding. (Although an excessively literal reading would require this finding before a party may "file" an action at all, such a reading produces an absurd result. *See Alitalia,* 128 F.Supp.2d at 343 n. 7.)

Of course, as the British domain names point out, the ACPA requires such a finding whether or not a defendant formally opposes the court's assertion of in rem jurisdiction. But this requirement does not somehow permit a defendant to oppose in rem jurisdiction whenever it pleases. Rather, the statutory requirement that the court make a specific finding *reduces* defendants' options by designating a finding that must be made, and thus a point at which the court will consider objections to the assertion of in rem jurisdiction.

In fact, as a matter of statutory language, the ACPA provides far less support to a requirement that jurisdictional conditions persist than does the text of the diversity statute. The diversity statute provides that "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs," and "is between" certain categories of litigants. 28 U.S.C.A. § 1332 (West 1993 & Supp.2002). Because nothing in the diversity statute refers to a time of determination, one could argue that if a time comes when "the matter in controversy" does *not* "exceed[ ]" $75,000,

or when complete diversity of citizenship no longer exists, a district court does not "have original jurisdiction" any longer.

By contrast, the anticybersquatting statute permits "the owner of a mark" to "file" an in rem action if "the court finds that the owner is not able to obtain in personam jurisdiction over a person who would have been a civil defendant." 15 U.S.C.A. § 1125(d)(2)(A)(ii)(I). Because the ACPA refers specifically to filing and a finding, it indicates far more clearly than the diversity statute that once the action is filed and the finding is made, in rem jurisdiction is ordinarily complete. In sum, the language of the anticybersquatting statute provides *less* support for the proposition that the conditions of filing must persist than the language of the diversity statute does—yet even in the stronger case of the diversity statute, the proposition fails. An argument that the Supreme Court has rejected in another context where it appeared more plausible is hardly persuasive here, in its weaker form.

Furthermore, the policy interests that lead courts to continue to entertain cases even after the end of conditions that originally yielded diversity jurisdiction apply with equal force to the jurisdiction created under the anticybersquatting statute. *See* 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, § 3608 (discussing policy). To see this, we need only consider that under the British domain names' theory, Holmgreen could have delayed even longer before submitting to personal jurisdiction; perhaps he might even have chosen to wait to see how the trial went, and then submitted to personal jurisdiction to stave off the expected entry of an adverse judgment. Nothing in the ACPA or its legislative history suggests that Congress intended to permit such manipulation. *See* 15 U.S.C.A. § 1125(d)(2); S.Rep. No. 106–140, at 10–11, 16 (1999);

H.R.Rep. No. 106–412, at 14 (1999); *see also generally FleetBoston*, 138 F.Supp.2d at 126–28 (describing the ACPA's "relatively complicated" legislative history).

### B.

Having thus rejected the argument that the ACPA's jurisdictional conditions must persist throughout the life of an in rem case, we have no difficulty in concluding that the British domain names objected much too late to in rem jurisdiction on the grounds of personal jurisdiction over their registrant, Holmgreen. They first challenged the court's in rem jurisdiction, contending that the ACPA violates the Constitution, in September 2000, and lost. The British domain names did not argue that the court lacked in rem jurisdiction because of the existence of in personam jurisdiction over their registrant until July 2001, only three days before the scheduled in rem trial, five months after the court's finding that in rem jurisdiction was proper, and a full nine months after their initial jurisdictional challenge.

At oral argument, the only explanation the British domain names could proffer for the July motion's untimeliness was "outrage" at Porsche's settlement tactics. A sense of "outrage" may explain Holmgreen's decision to submit to an in personam action in California, but it hardly provides a satisfactory legal basis for ignoring the lengthy delay. Moreover, this very suggestion—that a person with an interest in a case could properly yank it across the country a few days before trial merely to express his outrage, thus increasing the opponent's costs and imposing additional expense on the federal courts as a whole—well illustrates why the existence of jurisdiction should not be subject to manipulation in the later stages of litigation.

Because the British domain names delayed so long and entirely without excuse

in challenging in rem jurisdiction on the ground that personal jurisdiction existed, we need not address subtleties presented by the anticybersquatting law, such as what showing, if any, could justify reconsideration of an early finding that anticybersquatting in rem jurisdiction existed under § 1125(d)(2)(A)(ii)(I), or when and how such a showing would have to be made. We decide only that early in an anticybersquatting case, the availability of personal jurisdiction may defeat in rem jurisdiction over the name, *see, e.g., Lucent*, 95 F.Supp.2d at 531–34 (dismissing an in rem ACPA case after the plaintiff located the U.S.-based registrant five days after suing), and that submission three days before trial by a person who received actual notice of the in rem action nine months earlier is far too late.

### C.

■ Alternatively, the British domain names contend that a number of the in rem provisions of the ACPA violate the Due Process Clause. These arguments totally lack merit.

Some of the British domain names' constitutional arguments involve ACPA provisions not even at issue here. For example, they complain of a due process problem with 15 U.S.C.A. § 1125(d)(2)(C)(ii), which provides that the situs of a domain name may be the district in which the plaintiff deposits "documents sufficient to establish control and authority regarding the disposition of the registration and use of the domain name." 15 U.S.C.A. § 1125(d)(2)(C)(ii). *See Ford Motor Co. v. Greatdomains.com, Inc.*, 177 F.Supp.2d 656, 658–60 (E.D.Mich.2001); *Mattel, Inc. v. Barbie-Club.Com*, No. 00 CIV 8705

DLC, 2001 WL 436207 at *3–*4 (S.D.N.Y. May 1, 2001); *FleetBoston*, 138 F.Supp.2d 121. But another subsection of the ACPA, 15 U.S.C.A. § 1125(d)(2)(C)(1), alternatively locates the situs of a domain name in the district in which the registrar, registry, or other domain authority that registered or assigned the name is located. *See also* 15 U.S.C.A. § 1125(d)(2)(A) ("The owner of a mark may file an in rem civil action against a domain name in the judicial district in which the domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name is located [on certain conditions]."). Because the registrar with which Holmgreen registered the British domain names is based in the Eastern District of Virginia, jurisdiction is proper in that district without reference to the subsection (§ 1125(d)(2)(c)(ii)) that the domain names attack.[3]

The British domain names' principal constitutional challenge to the ACPA provisions at issue here centers on the "contacts" necessary for in rem jurisdiction. They argue that the Due Process Clause requires that to bring an ACPA in rem action in the Eastern District of Virginia, Porsche must prove that Holmgreen personally has minimum contacts with that jurisdiction. The British domain names contend that the minimum-contacts test of *International Shoe Company v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945), "applies to every exercise of judicial power," citing *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). Brief of Appellees at 26–27. However, as the domain names themselves recognize, *Shaffer* only holds that "[p]roperty alone is not sufficient 'con-

---

**3.** The British domain names also suggest that the ACPA's provisions for service of process in rem cases "may be" unconstitutional, without squarely arguing that they are. Brief of Appellees at 34. In fact, the British domain names responded to Porsche's suit in a timely way; plainly, therefore, actual notice existed in this case.

tact' to support personal jurisdiction over a non-resident *as to matters unrelated to the property*." Brief of Appellees at 27 (emphasis added). This accurate acknowledgment dooms their argument, because Porsche's claims against the British domain names are entirely "related to the property."

■ As the district court succinctly put it, in "an *in rem* proceeding in which the property itself is the source of the underlying controversy between plaintiff and defendant, ... due process is satisfied" by assigning jurisdiction based on the location of the property. *See Rush v. Savchuk*, 444 U.S. 320, 329, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) (considering the relationship of the relevant property to "the substance of the litigation" in assessing the constitutionality of an assertion of quasi in rem jurisdiction); *Shaffer*, 433 U.S. at 207, 97 S.Ct. 2569 ("[W]hen claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant, it would be unusual for the State where the property is located not to have jurisdiction."); *Harrods*, 302 F.3d at 224; *R.M.S. Titanic, Inc. v. Haver*, 171 F.3d 943, 957 (4th Cir.1999); *see also Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619–24, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990); *CNN v. CNNews.com*, 162 F.Supp.2d 484, 489–92 & n. 21 (E.D.Va.2001) (rejecting a due process challenge to the constitutionality of the in rem provision of the ACPA); *Caesars World, Inc. v. Caesars-Palace.com*, 112 F.Supp.2d 502 (E.D.Va.2000) (same); 4A Charles Alan Wright & Arthur R. Miller §§ 1072, 1073.1 (3d ed.2002) (suggesting that the ACPA's in rem provision would withstand constitutional due process scrutiny). In a case that directly concerns possession of the defendant domain names, the registrant's other personal contacts with the forum are constitutionally irrelevant to the assertion of in rem jurisdiction over the domain names he registered.

■ The British domain names seek to escape the consequences of this rule by asserting, apparently as a matter of common law, that domain names are not property—only an address. *But see Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1326–27 (9th Cir.1998) (exploring the value of the bundle of rights associated with registration of a domain name in rejecting an analogous position that "a domain name is nothing more than an address"). Congress plainly treated domain names as property in the ACPA, however. The domain names suggest that Congress lacked power to do so, but support this proposition only by analogizing to slavery's constitutionality before passage of the Thirteenth Amendment. Even if this ill-considered attempt to analogize from people to domain names constituted an argument, we would see no merit in it. Congress may treat a domain name registration as property subject to in rem jurisdiction if it chooses, without violating the Constitution. *See Caesars World*, 112 F.Supp.2d at 504; *Lucent*, 95 F.Supp.2d at 535.

We thus hold that the British domain names' challenges to the constitutionality of the ACPA are as meritless as its contentions that it could not, and did not, waive its objections to in rem jurisdiction under the ACPA.

### III.

■ Porsche argues that without reference to the ACPA, the district court had jurisdiction under 28 U.S.C.A. § 1655 over its trademark-dilution claims, seeking transfer and possession of the British and the Georgia domain names under 15 U.S.C.A. § 1125(c). Because this is Porsche's only argument that would yield jurisdiction in the Eastern District of Vir-

ginia over the Georgia domain names, we must reach it. We disagree with Porsche.

■ A trademark-dilution action under § 1125(c) and § 1655 simply cannot afford Porsche the only remedy it seeks in this case—transfer of the defendant domain names. If proved, a trademark-dilution claim entitles a plaintiff to an injunction that prevents a diluter from using the plaintiff's trademark. *See* 15 U.S.C.A. § 1125(c)(1, 2) (West 1998 & Supp.2002); *see also, e.g., TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88 (2d Cir. 2001) (considering an injunction that barred use of offending domain names under § 1125(a) and (c)); *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157 (3d Cir.2000) (affirming an injunction barring use of a name under § 1125(c)). Under certain circumstances, it may also entitle the plaintiff to a defendant's profits, damages, costs, and attorney's fees, and even to destruction of the offending materials. *See id.*; 15U.S.C.A. §§ 1117–18 (West 1994 & Supp.2002). But nothing in § 1125(c) alone entitles a plaintiff to *possess* the offending materials.

Section 1655, meanwhile, authorizes in rem jurisdiction "to enforce any lien upon, or claim to" property, or to remove an "incumbrance or lien" on property. 28 U.S.C.A. § 1655. Although the ACPA does authorize transfer of a domain name as relief, *see* 15 U.S.C.A. §§ 1125(d)(2)(D)(i), 1125(d)(1)(C), a trademark-dilution claim under § 1125(c) simply does not give Porsche a "lien upon, or claim to" the offending property. Porsche can thus assert no trademark right under § 1125(c) alone that is of the type that it may enforce through § 1655.

Nor will we stretch the trademark-dilution statute to afford Porsche the remedy it seeks. Because of the importance of domain names and the possibility of using them to do substantial damage to valuable trademarks, it might have been tempting, before the enactment of the ACPA, to try to provide such a remedy to holders of marks in cases involving domain names held by foreign registrants. *Cf. Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.Supp.2d 488, 504–05 (E.D.Va.1999) (ordering a trademark infringer to "relinquish all rights" to infringing domain names), *aff'd,* Nos. 99–1440 & 99–1442, 2000 WL 825881 (4th Cir. June 27, 2000).

To ensure a remedy in anticybersquatting cases, however, Congress chose not to amend § 1655, but to create a separate statutory provision, § 1125(d). If trademark-dilution law had allowed for a transfer remedy before the enactment of the ACPA, we could not conclude that the ACPA replaced that remedy, because Congress provided that the "in rem jurisdiction established under [§ 1125(d)] shall be in addition to any other jurisdiction that otherwise exists, whether in rem or in personam." 15 U.S.C.A. § 1125(d)(4). In so providing, however, Congress took no position on whether in rem jurisdiction under § 1655 "otherwise exists" for trademark-dilution claims under § 1125(c). *See also* S.Rep. No. 106–140, at 7–8 (noting "uncertainty as to the trademark law's application to the Internet" and noting that "legislation is needed to … provide adequate remedies"); H.R.Rep. No. 106–412, at 6 (1999) (same). We may and do conclude that the enactment of the ACPA eliminated any need to force trademark-dilution law beyond its traditional bounds in order to fill a past hole, now otherwise plugged, in protection of trademark rights.

As the Second Circuit recently remarked, the ACPA "was adopted specifically to provide courts with a preferable alternative to stretching federal dilution law when dealing with cybersquatting

cases." *Sporty's Farm,* 202 F.3d at 497; *see also Virtual Works, Inc. v. Volkswagen of Am., Inc.,* 238 F.3d 264, 267 (4th Cir. 2001) (describing the enactment of the ACPA as a response to "cybersquatters ha[ving] started to take the necessary precautions to insulate themselves from liability under the Federal Trademark Dilution Act" (citation omitted)). Furthermore, providing a domain name owner with a parallel trademark-dilution action under § 1655 would eviscerate restrictions that Congress placed on actions under the ACPA. *See* 15 U.S.C. § 1125(d)(2)(A). We decline to expand trademark-dilution law to provide an alternative and more permissive route to in rem jurisdiction than Congress provided in the anticybersquatting statute.

## IV.

In sum, Porsche may not seek possession of any offending domain name through a trademark-dilution claim under 15 U.S.C.A. § 1125(c) and 28 U.S.C.A. § 1655. Accordingly, we affirm the district court's judgment dismissing this claim. Assertion of in rem jurisdiction over Porsche's claims against the British domain names under 15 U.S.C.A. § 1125(d), however, does not violate constitutional principles of due process, and these domain names delayed too long in objecting to the district court's in rem jurisdiction on the ground that another court had in personam jurisdiction over their registrant. We therefore vacate the district court's judgment dismissing Porsche's anticybersquatting claims against the British domain names and remand for further proceedings consistent with this opinion. Because our disposition of Porsche's appeal moots the British domain names' claims for sanctions and attorney's fees, we dismiss the cross-appeal.

*AFFIRMED IN PART, DISMISSED IN PART, AND VACATED AND REMANDED IN PART.*